# EXHIBIT 3

1       UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF ILLINOIS
             EASTERN DIVISION
3 CHRISTOPHER WOODS      )
  individually and on behalf  )
4 of a class,           )
                 )
5      Plaintiff,     )
                 )
6    vs.           )No. 08 C 49
                 )
7 ROGERS ENTERPRISES, INC.,  )
  d/b/a ROGERS & HOLLANDS   )
8 JEWELERS, and DOES 1-10    )
                 )
9      Defendants.    )
10
11      The deposition of CHRISTOPHER WOODS
12 called by the Defendants, taken in accordance
13 with the applicable provisions of the Federal Rules
14 of Civil Procedure of the United States District
15 Courts pertaining to the taking of depositions,
16 taken before PEGGY CURRAN, CSR, RPR, CSR License
17 No. 084-2016, a notary public within and for the
18 County of DuPage and State of Illinois, taken at
19 180 North LaSalle Street, Chicago, Illinois, on
20 Monday, August 4, 2008, commencing at the hour of
21 9:30 a.m.
22
23
24

COPY

                                1

---

1 APPEARANCES:
2
3    Ms. Cassandra P. Miller
    Edelman, Combs, Latturner & Goodwin, LLC
    120 South LaSalle Street
4    18th Floor
    Chicago Illinois  60603
5    (312) 739-4200
      on behalf of the Plaintiff;
6
    Mr. Patrick T. Stanton
7    Dykema
    180 North LaSalle Street
8    Suite 2700
    Chicago, Illinois  60606
9    (312) 627-4600
      on behalf of the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                                2

---

1            I N D E X
2
3 WITNESS                    PAGE
4 CHRISTOPHER WOODS
5 EXAMINATION
6  By Mr. Stanton           4
7 WOODS DEPOSITION EXHIBITS      FOR ID
8  No. 1                 22
9  No. 2                 23
10  No. 3                 28
11  Nos. 4 and 5          31
12  No. 6                 33
13  No. 7                 35
14  Nos. 9 and 10         57
15
16
17
18
19
20
21
22
23
24

                                3

---

1       (Witness duly sworn.)
2       CHRISTOPHER WOODS,
3 called as a witness herein, having been first duly
4 sworn, was examined and testified as follows:
5       EXAMINATION
6    By Mr. Stanton:
7    Q    Good morning, my name is Patrick
8 Stanton. I represent Rogers Enterprises, also
9 known as Rogers & Hollands.
10       Let the record reflect this deposition
11 of Christopher Woods is taken pursuant to the
12 Federal Rules of Civil Procedure in the matter
13 captioned Christopher Woods versus Rogers
14 Enterprises, Inc., doing business as Rogers &
15 Hollands Jewelers and John Does 1 through 10.
16       Will you state your name, please?
17    A    Christopher A. Woods.
18    Q    Are you represented by counsel today?
19    A    Yes.
20    Q    Who is that?
21    A    Cassandra Miller, Edelman & Combs. The
22 list goes on.
23    Q    Have you ever had your deposition taken
24 before?

                                4

1    A    No.

2    Q    Have you ever testified in court?

3    A    No.

4    Q    Let me explain a few things about
5 today's proceeding.  I am sure your counsel
6 explained some of it to you already.

7         The method of recording our deposition
8 is done with a court reporter taking down every
9 word that is spoken.  What the court reporter does
10 not take down are shrugs, uh-huhs and things like
11 that.  So we have to do our best to be unlike
12 humans who normally communicate that way and make
13 sure we communicate orally.  Do you understand?

14    A    Yes.

15    Q    In addition, this is not meant to be a
16 torture or make it an unpleasant experience.  I
17 just want to get facts.

18         So if at any time you need a break, I
19 will likely be able to say fine, we will have one.
20 If there is a question pending, I may ask you to
21 answer that question first.

22         If at any time you have any questions,
23 don't understand the question, please let know.  Do
24 you understand?

                                                    5

1    A    Yes.

2    Q    Another thing that humans do all the
3 time is we often cut each other off.  That makes
4 for a very difficult time for our court reporter
5 and makes for what is a very bad transcript.  If
6 you do your best and I will do my best that we wait
7 and speak, that I finish speaking in asking my
8 questions, take a pause, and then answer and I will
9 do my best.  Okay?

10    A    Yes.

11    Q    If at any time you don't understand a
12 question, I want you to tell me so.  Okay?

13    A    Yes.

14    Q    Is it fair that if you don't tell me
15 that you misunderstood a question or don't
16 understand a question, I am going to assume you
17 understood it.  Is that okay?

18    A    Yes.

19    Q    Sir, are you on any medications?

20    A    Yes.

21    Q    What kind?

22    A    I am on Zoloft for depression.

23    Q    How often do you take that, sir?

24    A    Once a day.

                                                    6

1    Q    That's prescribed by a physician?

2    A    Yes.

3    Q    Any other medications?

4    A    No.

5    Q    Did you take a Zoloft today?

6    A    Yes.

7    Q    Does that in any way affect your
8 memory?

9    A    No.

10    Q    Do you have any other illnesses?

11    A    No.

12    Q    Have you imbibed in any alcohol?

13    A    No.

14    Q    Is there anything, any reason why you
15 would not be able to understand my questions
16 today?

17    A    No.

18    Q    Anything that would affect your
19 memory?

20    A    No.

21    Q    Okay.  What did you do to prepare for
22 your deposition, if anything?

23    A    Just read over the case, discovery.

24    Q    Anything else?

                                                    7

1    A    Just documents that Cassandra Miller
2 sent to me.

3    Q    Those were -- when did you receive those
4 documents?

5    A    Probably about a week and a half ago.

6    Q    When you say "the case," do you recall
7 what documents make up the case?

8    A    Not exactly.  That's why I have my
9 lawyer.

10    Q    Okay.  But do you recall the documents
11 you reviewed in preparation for your deposition?

12    A    Yes.  It was a discovery sheet and my
13 answers to the questions you guys have asked me.

14    Q    Okay.  From what you can tell, are all
15 the documents that you reviewed in preparation for
16 your deposition, those documents that either came
17 from my office or have been produced by your
18 counsel to me?

19    A    Yes.

20    Q    In our deposition notice we requested
21 the original receipt.  Did you bring that today?

22    MS. MILLER:  Yes.

23    THE WITNESS:  Yes.

24    MR. STANTON:  May I see it?

                                                    8

Page 9

1    MS. MILLER:  Sure.  Just so the record
2 reflects, it's marked as confidential pursuant to
3 the protective order that's been entered in the
4 case.
5    MR. STANTON:  Okay.  I will talk to you a
6 little bit later about that.
7    By Mr. Stanton:
8    Q    What's your date of birth, sir?
9    A    1/5/83.
10    Q    So that makes you?
11    A    25.
12    Q    Are you married?
13    A    No.  Engaged.
14    Q    You are engaged.  Congratulations.  How
15 long have you been engaged?
16    A    Since I bought the ring.
17    Q    That was in November of last --
18    A    Yes.
19    Q    -- year?
20    A    I proposed a little bit later than that
21 though.  Roughly.
22    Q    We are interrupting each other.  Let's
23 be careful there.
24         When did you become engaged.

Page 10

1    A    December 14th.
2    Q    What's your fiancee's name?
3    A    Tara.
4    Q    What is her last name?
5    A    Mundie.
6    Q    Can you spell that for me?
7    A    M-u-n-d-i-e.
8    Q    Do you have any children, sir?
9    A    No.
10    Q    Where do you currently live?
11    A    I live in Downers Grove.
12    Q    What's your address?
13    A    733, Unit 2, Winthrop Way.  I have to
14 apologize, I just moved there.
15    Q    That was my next question.  Do you own
16 or rent that place?
17    A    Own.
18    Q    Congratulations.  Do you live there on
19 your own or with someone else?
20    A    With my fiancee.
21    Q    You just moved in there.  When was
22 that?
23    A    Last Wednesday.
24    Q    Before that where did you live?

Page 11

1    A    In Westmont.  524 Brookside Drive,
2 Apartment C.
3    Q    How long did you live there?
4    A    One year.
5    Q    Did you live there alone or with someone
6 else?
7    A    Alone.
8    Q    Before that, where did you live, sir?
9    A    I lived in Wheaton.
10    Q    What was the address there?
11    A    It was off College Avenue.  I don't know
12 the exact address anymore.
13    Q    College residence?
14    A    I went to Elmhurst College.  I
15 attended -- I lived by Wheaton College actually,
16 just by the train.
17    Q    That was -- did you live there by
18 yourself or with others?
19    A    With a roommate.
20    Q    That was while you were at school --
21    A    Yes.
22    Q    -- in Elmhurst?
23         You cut me off again.  Careful.
24         Then did you have a couple other

Page 12

1 residences while you were in college or just that
2 one?
3    A    Just that one.  I stayed in the dorms
4 previous to that.
5    Q    Then before that you lived at home with
6 your parents?
7    A    Yes.
8    Q    Where was that?
9    A    That was at 1013 Cherokee Drive,
10 Darien.
11    Q    They still live there?
12    A    No.
13    Q    When you moved out, that was where they
14 lived?
15    A    Yes.
16    Q    Did you graduate from high school,
17 sir?
18    A    Yes, I did.
19    Q    Where?
20    A    Hinsdale South.
21    Q    When was that?
22    A    That was 2001.
23    Q    College, you mentioned Elmhurst
24 College?

| | | |
|---|---|---|
| 1 | A | Elmhurst College. |
| 2 | Q | Is that where you went to college? |
| 3 | A | Yes. |
| 4 | Q | Anywhere else? |
| 5 | A | COD for the first part of my college |
| 6 | | years. |
| 7 | Q | College of DuPage? |
| 8 | A | Yes.  Sorry about that. |
| 9 | Q | That's fine.  Did you graduate from |
| 10 | | college? |
| 11 | A | Yes. |
| 12 | Q | When was that? |
| 13 | A | Two thousand -- December -- actually |
| 14 | | it's February of 2006. |
| 15 | Q | What was your degree in? |
| 16 | A | Business administration. |
| 17 | Q | Any particular specialty? |
| 18 | A | No. |
| 19 | Q | Your fiancee, does she have a college |
| 20 | | degree? |
| 21 | A | Yes.  She has a degree in psychology |
| 22 | | from Iowa State. |
| 23 | Q | Have you had any education or training |
| 24 | | since you graduated from college? |

13

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Are you employed, sir? |
| 3 | A | Yes, I am. |
| 4 | Q | Where? |
| 5 | A | For a company called Web QA.  W-e-b Q-A. |
| 6 | | That's in Woodridge. |
| 7 | Q | You are anticipating me now. |
| 8 | | How long have you worked at Web QA? |
| 9 | A | Just over a year.  I started there last |
| 10 | | June. |
| 11 | Q | Then before June of last year, what was |
| 12 | | your -- were you employed? |
| 13 | A | Yes, I worked at Sears Outlet. |
| 14 | Q | Where was that? |
| 15 | A | That was in Darien. |
| 16 | Q | How long did you work at Sears? |
| 17 | A | Roughly about four months. |
| 18 | Q | What did you do at Sears? |
| 19 | A | Just sold appliances. |
| 20 | Q | Before your job at Sears? |
| 21 | A | I was a carpenter at Elmhurst College. |
| 22 | Q | Was that while you were in school or |
| 23 | | afterwards or both? |
| 24 | A | While I was in school.  I was classified |

14

| | | |
|---|---|---|
| 1 | | as a student worker. |
| 2 | Q | You are not a journeyman or in the |
| 3 | | union? |
| 4 | A | No.  This is just work study.  Basically |
| 5 | | that's what it was. |
| 6 | Q | What's your current job title at |
| 7 | | Web QA? |
| 8 | A | Corporate support supervisor. |
| 9 | Q | What does a corporate support supervisor |
| 10 | | do? |
| 11 | A | Deals with all the networking of |
| 12 | | computers.  I deal with as far as clients, as far |
| 13 | | as if they have technical questions, I deal with |
| 14 | | that. |
| 15 | | Mainly we are a software company, so we |
| 16 | | have to -- we do a lot of work with governments, so |
| 17 | | we have to deal with government web sites and |
| 18 | | things like that. |
| 19 | Q | A better question for now.  What's the |
| 20 | | business of Web QA? |
| 21 | A | That's a good question.  What we do is |
| 22 | | we, like your common FAQ pages, for cities, they |
| 23 | | have frequently asked questions, they have service |
| 24 | | requests, and that's our product basically that |

15

| | | |
|---|---|---|
| 1 | | cities put on their web sites for citizens to go |
| 2 | | and ask questions of city members, make a request |
| 3 | | for something, maybe a pothole or something like |
| 4 | | that. |
| 5 | Q | So web question and answers, is that |
| 6 | | it? |
| 7 | A | Yes.  You are absolutely correct. |
| 8 | Q | Okay.  How many people are employed at |
| 9 | | Web QA? |
| 10 | A | There are currently 23. |
| 11 | Q | Since you joined Web QA last year in |
| 12 | | June, have you been -- I forgot your title, |
| 13 | | corporate service? |
| 14 | A | Corporate support supervisor. |
| 15 | Q | Corporate support supervisor. |
| 16 | A | No, I have not.  I started out in sales, |
| 17 | | started in sales, got promoted to implementation |
| 18 | | coordinator.  Then I recently just got promoted |
| 19 | | again to what I am now. |
| 20 | Q | So you have a staff working for you? |
| 21 | A | Yes. |
| 22 | Q | How many people? |
| 23 | A | Two. |
| 24 | Q | And to whom do you report? |

16

1    A    I report to our director of
2  operations.
3    Q    How much vacation do you get a year from
4  Web QA?
5    A    Two weeks vacation and another week of
6  sick and personal time.
7    Q    So if this case went to trial and say it
8  took a week to two weeks to try, how would you be
9  able to attend trial?
10   A    I have vacation time left, plus some
11 personal days.
12   Q    You are willing to use that time for
13 this?
14   A    If necessary.
15   Q    Have you ever been arrested, sir?
16   A    Yes, I have.
17   Q    When was that?  First, how many times?
18   A    Three.
19   Q    Let's go with the most recent.
20   A    Most recent was November of 2005.
21   Q    Okay.  Where was that?
22   A    That was in Elmhurst for a DUI.
23   Q    What was the disposition after that
24 arrest?  In other words, were you convicted of a

17

1  DUI?
2    A    Yes, I was convicted.
3    Q    Was that after a trial or was that a
4  plea?
5    A    That was a plea.
6    Q    What was the sentence?
7    A    Two weeks in DuPage County.
8    Q    Two weeks in jail?
9    A    Yes.
10   Q    Did you receive any treatment for
11 alcohol abuse?
12   A    Yes.
13   Q    You did.  Where did you receive that
14 treatment?
15   A    Hinsdale Hospital through the New Day
16 program.
17   Q    New Day?
18   A    Yes.
19   Q    Are you an alcoholic?
20   A    Yes.
21   Q    How long have you been sober?
22   A    Three years in November.
23   Q    Do you attend AA or anything like
24 that?

18

1    A    Yes, I do.
2    Q    Where do you do that?
3    A    I do that in Westmont.
4    Q    Before the November 2005 arrest, what
5  was the next most recent one?
6    A    October 2005.
7    Q    What was that -- where was that?
8    A    That was in Lombard.
9    Q    Okay.  What was the charge?
10   A    That was reckless driving.
11   Q    What were the circumstances in that?
12   A    As far as?
13   Q    What is it that you were doing that
14 caused the police officer to give you a ticket for
15 wreckless driving or arrest you for that?
16   A    I got pulled over originally for a
17 headlight out and it was originally DUI reduced to
18 reckless driving.
19   Q    What was the sentence for reckless
20 driving?
21   A    A fine.
22   Q    How much was that fine, sir?
23   A    $2,000.
24   Q    Anything else?

19

1    A    No.
2    Q    Previous to -- the other arrest prior to
3  October of 2005?
4    A    November of 2004.
5    Q    Where was that?
6    A    That was in Naperville.
7    Q    What was the charge there, sir?
8    A    DUI.
9    Q    What was the disposition or sentence on
10 that?
11   A    Fines and court costs.
12   Q    That was you pled to that as well?
13   A    Yes.
14   Q    I assume in the October 2005, you
15 pleaded to that as well?
16   A    Yes.
17   Q    Sir, you are the plaintiff in the matter
18 of Christopher Woods versus Rogers & Hollands,
19 right?
20   A    Correct.
21   Q    Are you familiar with the complaint that
22 was filed on your behalf?
23   A    Yes.
24   Q    Did you review it before it was filed?

20

CHRISTOPHER WOODS - AUGUST 4, 2008

1   A    Yes.

2   Q    If the complaint was filed in January,
3 January 3rd, 2008, when did you review it before
4 that time?

5   A    Probably just before that, when I had
6 talked to Cassandra Miller to review it.

7   Q    Did you do that in Ms. Miller's office
8 or did you do it at home?

9   A    Over the phone.

10  Q    On the phone.  You were sent a copy of
11 the --

12  A    Yes.  Correct.

13  Q    -- complaint?

14       We are cutting each other off, but we
15 are doing well so far.

16       Was it fax'd or e-mailed to you or
17 mailed, how was it sent to you?

18  A    U.S. Mail.

19  Q    Was everything in the complaint that you
20 reviewed true as far as you knew?

21  A    Correct.

22  Q    Is it based on your personal
23 knowledge?

24  A    As far as?

21

1 don't know if you can.

2       MS. MILLER:  Just as best as you can answer.

3       THE WITNESS:  Probably middle of December, my
4 best guess.

5   By Mr. Stanton:

6   Q    So three weeks or so?

7   A    Yes.

8   Q    Before Christmas?

9   A    Yes.

10  Q    Before you got engaged or after you got
11 engaged?

12  A    I don't remember that.

13  Q    Hey, that's a point in time you should
14 remember, sir.  I just had my 10th anniversary
15 Friday, so believe me, I recognize the importance.

16       You are aware there was an amended
17 complaint filed, right, sir?

18  A    Correct.

19  Q    I am going to show you that as well for
20 you to identify it.

21       (A document was marked as Woods
22        Deposition Exhibit No. 2 for
23        identification.)

24

23

1   Q    The contents of the complaint.

2   A    Yes.  What my lawyer had told me and
3 that's why I have a lawyer.

4   Q    You did authorize the filing of the
5 complaint, right?

6   A    Correct.

7       (A document was marked as Woods
8        Deposition Exhibit No. 1 for
9        identification.)

10  By Mr. Stanton:

11  Q    The court reporter has shown you what's
12 been marked as Exhibit 1 for your deposition, which
13 is styled a complaint, class action, bearing case
14 No. 08 C 49.

15       Sir, is this the complaint that you
16 authorized filing in your behalf?

17  A    Correct.

18  Q    Of this was filed on January 3, 2008,
19 sir, to give you a point of reference, how -- when
20 in relation to the filing of this complaint did you
21 retain Edelman & Combs to represent you?

22  A    Before that was filed.

23  Q    A month, two weeks, a day?

24  A    I'm not exactly sure on the date.  I

22

1   By Mr. Stanton:

2   Q    Sir, the court reporter has handed you
3 what has been marked as Exhibit 2, which purports
4 to be Plaintiff's First Amended Complaint, Class
5 Action, which was filed on July 10, 2008, in the
6 United States District Court for the Northern
7 District of Illinois.

8       Have you ever seen Exhibit 2 before,
9 sir?

10  A    Yes, I have.

11  Q    What is it?

12  A    That's just basically, it's just doing a
13 class action, amending it.

14  Q    Did you review the Exhibit 2 before it
15 was filed?

16  A    I can't remember off the top of my head.
17 I would guess yes.

18  Q    Do you recall anything about an amended
19 complaint being filed?

20  A    Yes, I do.  I remember Cassandra and
21 I --

22  Q    I am going to caution you just for a
23 moment.  I am not looking for your communications
24 with your lawyer, generally speaking.  I don't want

24

1  anything that's usually considered attorney-client
2  privilege.  But I just want to get a sense of do
3  you recall the filing of the amended complaint and
4  I want to know whether you reviewed it before it
5  was filed.  I am trying to help you remember.
6      A    I do remember talking about it.  I'm
7  trying to remember off the top of my head if I had
8  received it before the file date, which I would
9  have, so yes.
10     Q    You don't have a specific recollection
11 one way or the other whether or not you reviewed it
12 before it was filed?
13     A    Correct.
14     Q    Do you know why an amended complaint was
15 filed, sir?
16     A    Yes, because there was a law passed
17 stating something about the expiration date.
18     Q    Anything else you recall?
19     A    No.
20     Q    Have you, since this Exhibit 2 was
21 filed, have you reviewed it?
22     A    Yes.
23     Q    Is it true to the best of your
24 knowledge?

25

1      Q    I just want to know your understanding.
2  That's all.
3           Was November 2007 the first time you
4  bought anything at Rogers & Hollands?
5      A    Yes.
6      Q    You were going there to get an
7  engagement ring?
8      A    Correct.
9      Q    She said yes?
10     A    That she did.
11     Q    That's good.  All right.  Since that
12 time, how many times have you shopped at Rogers &
13 Hollands?
14     A    I have been there once since that
15 time.
16     Q    Since that time.  What did you -- you
17 made a second -- did you make a purchase on that
18 visit?
19     A    Yes, I did.
20     Q    What did you purchase that time?
21     A    I actually purchased some kind of
22 diamond necklace, I don't know.
23     Q    How did you pay for the diamond necklace
24 the second time you visited at Rogers & Hollands?

27

1      A    Yes.
2      Q    What's your understanding of the claim
3  you have made against Rogers & Hollands in your
4  complaint and amended complaint?
5      A    According to my amended complaint it has
6  more than five digits of my credit card number on
7  there, which is against the FACTA law.
8      Q    Just to break it out.  The receipt you
9  received from Rogers & Hollands had more than five
10 digits on it; is that correct?
11     A    Correct.
12     Q    Your allegation is that that violates
13 FACTA?
14     A    From my understanding of it, yes.
15     Q    What's your understanding of the damages
16 you are seeking in the amended complaint, if any?
17     A    Anywhere from $100 to $1,000 I
18 believe.
19     Q    And what do you need to prove in order
20 to establish your entitlement to those damages?
21     A    My credit card receipt.
22     Q    Anything else?
23     A    That would be where my lawyer would come
24 into play.

26

1      A    Using their house credit card or the
2  Rogers & Hollands credit card.
3      Q    When did you get a Rogers & Hollands
4  credit card?
5      A    On the same day I purchased the ring, I
6  applied for it and went from there.
7      MR. STANTON:  Why don't we use, with your
8  consent, Cassandra, we will use this photocopy as
9  sort of what will be in our transcript, but we will
10 go over your original to see if that's fair.
11     MS. MILLER:  That's fine.
12          (A document was marked as Woods
13           Deposition Exhibit No. 3 for
14           identification.)
15     By Mr. Stanton:
16     Q    Sir, the court reporter has marked and
17 given to you what has been marked Exhibit 3, which
18 is a photocopy of at least one side of a credit
19 card receipt.  Do you recognize Exhibit 3?
20     A    Yes, I do.
21     Q    There is a signature at the bottom.  Do
22 you see it?
23     A    Yes.
24     Q    Is that your signature?

28

1  A   That is.

2  Q   Will you identify for me what Exhibit 3

3 is?

4  A   Credit card receipt from Rogers &

5 Hollands.

6  Q   It bears the date, appears of

7 November 23, 2007; is that correct?

8  A   Yes.

9  Q   Is that the day you bought the

10 engagement ring?

11  A   Correct.

12  Q   I see here that the retail price looks

13 like it was $1,999; is that correct?  I guess I am

14 wrong.

15  A   No.

16  Q   I see.

17  A   That was the list price.  The selling

18 price was 1,799.

19  Q   Good negotiating.  $1,799.  On that day

20 you used both a -- did you use a Visa card or a

21 Mastercard?

22  A   That was a Mastercard.

23  Q   Mastercard as well as an in-house card,

24 right?

29

1  A   Correct.

2  Q   Why did you -- you applied for a Rogers

3 & Hollands credit card during your visit to the

4 store on November 23, 2007, correct?

5  A   Correct.

6  Q   Why did you apply for a Rogers &

7 Hollands card at that time?

8  A   Zero percent financing.

9  Q   Why is it that you didn't put -- strike

10 that.

11      Describe for me sort of the process of

12 applying for a Rogers & Hollands credit card on

13 November 23, 2007, if you would, please?

14  A   They had me fill out an application,

15 which they again processed and then approved me for

16 a certain line of credit or a certain amount of

17 credit.

18  Q   Do you recall what that level was?

19  A   I believe it was 1,500.

20  Q   Were you given any documentation in

21 connection with that application?

22  A   Just my receipt, and little pamphlets,

23 credit as far as disclaimers and all that stuff.

24

30

1      (Documents were marked as Woods

2       Deposition Exhibit Nos. 4 and 5 for

3       identification.)

4  By Mr. Stanton:

5  Q   The court reporter has marked Exhibits 4

6 and 5 and handed them to you.  Sir, Exhibit 4, it

7 appears it be a revolving credit account

8 application from Rogers & Hollands.  Do you see

9 your signature on Exhibit 4?

10  A   Yes, I do.

11  Q   Is this the credit application, or at

12 least a copy of the credit application you filled

13 out at Rogers & Hollands on November 23, 2007?

14  A   Yes.  They filled it out for me.  I just

15 gave them the information.

16  Q   So for instance, your driver's license,

17 they asked for your driver's license and the

18 associate at Rogers & Hollands filled in the

19 number?

20  A   Yes.

21  Q   Is that accurate?

22  A   Yes, it is.

23  Q   Is there anything, in reviewing

24 Exhibit 4, in the application that is inaccurate?

31

1  A   Not to my knowledge.

2  Q   Who is Lynn Troy?

3  A   That is my mother.

4  Q   Turning to Exhibit 5, sir.  Exhibit 5

5 appears to be a copy of a revolving credit account

6 agreement.  Did you receive a copy of Exhibit 5

7 when you applied for your credit at Rogers &

8 Hollands?

9  A   Yes, I did.

10  Q   I think this is probably obvious now.

11 You were given a $1500 credit line?

12  A   Correct.

13  Q   That's why you split it between your

14 Mastercard and your Rogers & Hollands card?

15  A   Correct.

16  Q   Did you ultimately receive a Rogers &

17 Hollands credit card?

18  A   Yes.

19  Q   Each month you receive bills from Rogers

20 & Hollands?

21  A   Correct.

22  Q   You haven't -- have you paid off the

23 balance?

24  A   No, I have not.

32

```
 1          (A document was marked as Woods
 2           Deposition Exhibit No. 6 for
 3           identification.)
 4     By Mr. Stanton:
 5     Q    Sir, the court reporter has marked as
 6 Exhibit 6 a series of documents that appear to be
 7 statements from Rogers & Hollands on your credit
 8 card.  I will recite just for the record, these are
 9 Bates labeled RH 121 through 124 and RH 1193
10 through 1195.
11          Sir, if you could review the contents of
12 Exhibit 6, tell me if you recognize any of these
13 documents?
14     A    Yes, I do.
15     Q    What are they?
16     A    These are just my payment bills from
17 Rogers & Hollands credit card.
18     Q    Did you receive these?
19     A    Yes, I did.
20     Q    Now, it reflects on the first page,
21 RH 121, appears to reflect your purchase on
22 November 23; is that correct?
23     A    Uh-huh.  It does.
24     Q    And then it shows a payment in December,
```
                                                      33

```
 1 December 21st, correct?
 2     A    Yes.
 3     Q    You have been paying it looks like from
 4 reviewing these roughly $50 a month; is that
 5 correct?
 6     A    That is correct.
 7     Q    Have you missed any payments?
 8     A    No, I have not.
 9     Q    Then if we flip through to Bates RH 123,
10 which appears to be a statement for February of
11 2008, you see a purchase of $106, correct?
12     A    That is correct.
13     Q    That's the diamond, was it pendant or
14 something?
15     A    Yes.
16     Q    Do you have any complaints about the
17 merchandise you received from Rogers & Hollands?
18     A    No, I do not.
19     Q    Do you have any other problems with the
20 credit process with Rogers & Hollands other than
21 what's alleged in your complaint?
22     A    I do not.
23     Q    So everything that they have -- they
24 appear to have adhered to their credit agreement
```
                                                      34

```
 1 with you; is this correct?
 2     A    Correct.
 3     Q    Are you able to make the monthly
 4 payment?
 5     A    Yes.
 6     Q    How much do you maker a year, sir?
 7     A    I make $37,000.
 8     Q    Do you get a bonus typically or no?
 9     A    No.
10          (A document was marked as Woods
11           Deposition Exhibit No. 7 for
12           identification.)
13     By Mr. Stanton:
14     Q    I apologize.  The court reporter has
15 marked as   Exhibit 7 a document bearing Bates
16 RH 119, which is a very bad photocopy of a credit
17 card receipt.  I don't know if you can read it or
18 not.  It appears to be your purchase from February
19 of 2008.  Can you read that or no?
20     A    Not really.
21     Q    Okay.  Do you recall when you made --
22 you put it on your Rogers & Hollands card when you
23 purchased the diamond pendant in February of 2008,
24 right?
```
                                                      35

```
 1     A    Correct.
 2     Q    Did you review the receipt after you
 3 made the purchase?
 4     A    Yes.
 5     Q    Did you check and verify that the credit
 6 card numbers were truncated?
 7     A    Yes, they were.
 8     Q    Did you go to Rogers & Hollands that day
 9 just to see if they truncated the credit card
10 receipt?
11     A    No.
12     Q    So as far as you can tell, after, at
13 least shortly after filing the complaint, Rogers &
14 Hollands had changed its credit card receipts,
15 correct?
16     A    Yes, they did.
17     Q    Now, your credit card receipt -- your
18 credit card at Rogers & Hollands, can you use that
19 anywhere else other than at Rogers & Hollands?
20     A    No.
21     Q    And the limit is 1500, right?
22     A    Correct.
23     Q    And your current balance, do you know
24 what it is?
```
                                                      36

CHRISTOPHER WOODS - AUGUST 4, 2008

1  A    I believe right around 1200.
2  Q    So then you have about 200, $300 of
3  available line of credit on that?
4  A    Correct.
5  Q    So if someone used your Rogers &
6  Hollands credit card fraudulently, they couldn't
7  take it to another store, correct?
8  A    Correct.
9  Q    And if somebody actually used -- strike
10 that.
11      You worked at Sears for four months.
12 A    Correct.
13 Q    Did you work at any other retail
14 company?
15 A    No.
16 Q    And you rung up customers at Sears,
17 correct?
18 A    Correct.
19 Q    Is that where you learned about FACTA?
20 A    No.
21 Q    How did you learn about FACTA?
22 A    My stepfather is a lawyer.
23 Q    What's his name?
24 A    Steve Troy.

37

1  A    Yes, I did.
2  Q    Did you advise anybody at the store
3  about that?
4  A    No.
5  Q    At any time other than the filing of
6  this complaint, did you advise Rogers & Hollands
7  lands about the failure to truncate these receipt
8  numbers?
9  A    No.
10 Q    Is Mr. Troy -- Mr. Troy, did he refer
11 you to the Edelman & Combs firm?
12 A    Yes.
13 Q    Do you know if Mr. Troy is receiving any
14 compensation for referring you to the Edelman &
15 Combs firm?
16 A    No.
17 Q    Do you know if Mr. Troy has any past
18 experience with the Edelman & Combs firm in terms
19 of referring cases?
20 A    I believe in the past they have.
21 Q    Do you know if he has received
22 compensation as a result of those referrals?
23 A    I have no idea.
24 Q    Did Mr. Troy tell you what the damages

39

1  Q    Where does he practice?
2  A    He practices in Joliet.
3  Q    How did you -- what did Mr. Troy tell
4  you about FACTA?
5  A    He just told me basically you are only
6  allowed to, companies are only allowed to put on a
7  certain number of digits from the credit card
8  number.
9  Q    How did it come about that Mr. Troy was
10 advising you about this?
11 A    He had just mentioned it to me
12 previously.
13 Q    Before or after you made your purchase
14 from Rogers & Hollands --
15 A    Before.
16 Q    Let me finish my question.
17      Before or after you made your purchase
18 at Rogers & Hollands on November 23, 2007 did
19 Mr. Troy advise you about the requirements of
20 FACTA.
21 A    Before.
22 Q    So you received your receipt from Rogers
23 & Hollands on November 23, 2007, did you notice
24 that it wasn't truncated when you bought it?

38

1  would be in a claim that you brought against Rogers
2  & Hollands?
3  A    Yes.
4  Q    What did he tell you?
5  A    He said $1,000.
6  Q    Did he advise you to be a class
7  representative?
8  A    No.
9  Q    What's your understanding of what you
10 can receive as a class representative if a class is
11 certified?
12 A    To my knowledge, 100 to $1,000.
13 Q    Now if someone, just generally speaking,
14 I want to get your understanding, if someone were
15 to get my Rogers & Hollands card, say I have one,
16 don't tell my clients I don't have one, and if
17 someone were to get my number and they were to
18 purchase a diamond ring at Rogers & Hollands using
19 my number fraudulently, what's your understanding,
20 would I have to pay the bill when it came?
21 A    I don't believe so, but I could be
22 wrong.
23 Q    That's your understanding?
24 A    Yes.

40

CHRISTOPHER WOODS – AUGUST 4, 2008

1    Q    So that if someone took your credit card
2  receipt that had your -- had eight digits and were
3  able to figure out what your credit card number is
4  at Rogers & Hollands and went and purchased I guess
5  $230 or $40 worth of merchandise at Rogers &
6  Hollands and that bill came to you, you wouldn't
7  have to pay it?
8    A    Correct.
9    Q    Again, you couldn't take the Rogers &
10 Hollands number and take it and buy anything else
11 anywhere else, correct?
12   A    Correct.
13   Q    Are you aware of any way in which
14 someone could use your Rogers & Hollands card to --
15 let me withdraw that.
16       In your complaint you use the term
17 identity theft.  What's that?
18   A    Someone taking my, as far as
19 information, such as social security number,
20 driver's license number, birthday, and whether it
21 be applying for different credit cards, purchasing
22 cars, that would be my definition.
23   Q    Are you aware of any way in which
24 someone could take your Rogers & Hollands credit

41

1  the eight digits from Rogers & Hollands and commit
2  identity theft other than purchasing goods at
3  Rogers & Hollands?
4    A    I'm sure there would be a way.
5    Q    You are not aware of any way?
6    A    No, I am not.
7    Q    I just want to make sure.  Are you aware
8  of any expert that has been retained in this case
9  at this point that is going to give an opinion as
10 to how someone can commit identity theft using
11 those eight digits from the Rogers & Hollands card
12 number?
13   A    No, I am not.
14   Q    When you were a sales associate at
15 Sears, as I understand you were not advised about
16 FACTA; is that correct?
17   A    Correct.
18   Q    Do you know if Sears while you were
19 working there was truncating credit card numbers?
20   A    I believe they were, but I couldn't tell
21 you.  To the best of my knowledge, I believe they
22 were.
23   Q    But before your stepfather told you
24 about FACTA, you never heard of it, right?

43

1  card number, the eight digit Rogers & Hollands
2  credit card number and do identity theft?
3    A    Yes.
4    Q    How?
5    A    They have my name on there.  I'm sure
6  they can find out my social security number
7  somewhere else.
8    Q    Is it your complaint that your name was
9  on the receipt?
10   A    No, it's the fact that there are eight
11 digits on there.
12   Q    How is it with eight digits of the
13 Rogers & Hollands card could someone commit
14 identity theft on you?
15   A    I'm not really an identity theft expert,
16 but I'm sure there is ways to take that eight
17 numbers and do -- purchase something with it over
18 the Internet.
19   Q    Something from Rogers & Hollands?
20   A    Yes.
21   Q    You already testified that you would not
22 be liable for that purchase though, right?
23   A    Correct.
24   Q    Any other way in which someone can take

42

1    A    Correct.
2    Q    You never read any articles about FACTA
3  before that, had you?
4    A    No.
5    Q    Just a couple things.  You are not a
6  party to any other lawsuits, right?
7    A    I'm sorry?
8    Q    Are you a party to any other lawsuits,
9  sir?
10   A    No.
11   Q    Have you ever been sued?
12   A    No.
13   Q    Ever defaulted on any loans?
14   A    No.
15   Q    Filed bankruptcy?
16   A    No.
17   Q    Have you ever gotten notice of a class
18 action before that you were going to be part of?
19   A    No.
20   Q    Never got a mailing saying send this in
21 and you can get a recovery in a class action?
22   A    No.
23   Q    Ever notice in advertisement in the
24 newspaper saying, if you purchase these goods or

44

1  you did this in this period of time, you could be
2  part of a class action?
3      A    I have seen it on TV I think.
4      Q    Have you ever seen one where you would
5  have been a member?
6      A    No.
7      Q    Let me understand a little better.  So
8  you bought your engagement ring on November 23,
9  2007.  You knew when you purchased it and received
10  the receipt that it didn't comply with FACTA,
11  correct?
12     A    Correct.
13     Q    Did you then talk to Mr. Troy about
14  it?
15     A    Yes.
16     Q    You showed him the receipt?
17     A    Yes.
18     Q    And then how much -- was that a day
19  later, a week later, how long?
20     A    Probably less than a week.
21     Q    Then how much longer until you talked to
22  the Edelman & Combs firm?
23     A    Probably a little bit before middle of
24  December or right around that time frame.

45

1      Q    Okay.  So right around your
2  engagement?
3      A    Uh-huh.
4      Q    Okay.  When did you first meet -- did
5  you have your first discussion or meeting with the
6  Edelman & Combs firm in person or on the phone?
7      A    On the phone.
8      Q    With whom did you speak?
9      A    Cassandra Miller.
10     Q    Have you spoken to anyone else at
11  Edelman & Combs other than Cassandra Miller?
12     A    I haven't spoken to them, but a guy
13  named Jonathan, I am not sure who -- I know he
14  works there, he has left me messages just about
15  updates and things like that.
16     Q    Anyone else?
17     A    Not to my knowledge.
18     Q    Have you ever met Cathleen Combs?
19     A    No.
20     Q    Dan Edelman?
21     A    No.
22     Q    Jim Latturner?
23     A    No.
24     Q    Before your stepfather introduced you to

46

1  Edelman & Combs, had you ever heard of the Edelman
2  & Combs firm?
3      A    No, I had not.
4      Q    You had no dealings whatsoever with
5  them?
6      A    No.
7      Q    You did ultimately hire the Edelman &
8  Combs firm to represent you in this lawsuit,
9  correct?
10     A    Correct.
11     Q    Do you have a written agreement with
12  Edelman & Combs?
13     A    Yes, I do.
14          (A document was marked as Woods
15          Deposition Exhibit No. 8 for
16          identification.)
17  By Mr. Stanton:
18     Q    Sir, the court reporter has marked as
19  Exhibit 8 what appears to be a three page document
20  with labels 803 to 805.
21          Sir, do you recognize Exhibit 8?
22     A    Yes, I do.
23     Q    On the third page of Exhibit 8 bearing
24  Bates 805, is that your signature?

47

1      A    Correct.
2      Q    Do you see on the bottom there, there is
3  a line for Cathleen Combs to sign, do you see
4  that?
5      A    Yes, I do.
6      Q    Do you have a copy of this agreement
7  signed by Ms. Combs?
8      A    I do at home.
9      Q    And you recall it was signed by
10  Ms. Combs?
11     A    I'm not positive that it was signed, but
12  I know I have this document.
13     Q    You don't know that it was signed?
14     A    Correct.
15     Q    There is portions of it that have been
16  redacted by your counsel.  In general, what is your
17  understanding of this agreement between you and the
18  law firm Edelman, Combs, Latturner & Goodwin?
19     A    That they will take on the expenses as
20  far as proceeding with this and will represent me
21  as their client.
22     Q    Anything else?
23     A    Not to my knowledge.
24     Q    How does Edelman, Combs, Latturner &

48

1  Goodwin get paid?
2      A    Honestly I don't know.  That's not
3  really my deal right now.
4      Q    Who pays for the cost of proceeding with
5  this lawsuit?
6      A    Edelman & Combs law firm.
7      Q    Okay.  Are you aware that if Rogers &
8  Hollands should win this lawsuit, that the
9  plaintiff would likely be taxed with costs, do you
10  understand that?
11      A    Yes, I do.
12      Q    Who would be liable for those costs?
13      A    That would be me.
14      Q    Have you been advised about how much the
15  costs would be?
16      A    Not currently.
17      Q    And you are willing to pay those
18  costs?
19      A    Yes.
20      Q    Have you signed any other agreements
21  other than Exhibit 8 with the Edelman & Combs
22  firm?
23      A    No, I have not.
24      Q    Earlier you testified in terms of your

                                              49

1  claims -- first, withdraw that.
2          Sir, are you claiming that you have been
3  subjected to any actual damages as a result of
4  Rogers & Hollands' failure to truncate your credit
5  card receipt?
6      A    No, I am not.
7      Q    You purport to represent, if the class
8  is certified, people who have had actual damages
9  versus just statutory damages?
10      A    Can you rephrase that?
11      Q    Sure.  If the class is certified here,
12  will you be representing people who have sustained
13  actual damages?
14      A    Yes, I will.
15      Q    How is it -- what will you do about
16  people, because you are the class representative
17  here, what will you do about people who have actual
18  damages, how will you represent them in terms of
19  your claim?
20      A    Because I am going to make sure that
21  they -- as head of the class, I am kind of the one
22  that makes the decision once a, I guess, verdict is
23  figured out, whether or not to accept it or not.
24  So if I believe it's a benefit to the other

                                              50

1  consumers, then it's my job to say yes or no to
2  whatever is offered.
3      Q    That sounds like a settlement
4  discussion, correct?
5      A    Correct.
6      Q    In terms of a verdict -- your complaint
7  doesn't ask for any actual damages, correct?
8      A    Correct.
9      Q    How are you going to represent people
10  with actual damages?
11      A    By being head of the class and making
12  sure that they are productive.
13      Q    If someone has actual damages in excess
14  of $1,000, they will get less than their actual
15  damages, correct?
16      A    Correct.
17      Q    Pardon me.  It goes faster when I take
18  this little bit of down time actually.
19          You are not claiming that anybody used
20  your credit card number at Rogers & Hollands
21  fraudulently, correct?
22      A    Correct.
23      MR. STANTON:  Off the record for a second.
24          (A discussion was had off the record.)

                                              51

1  By Mr. Stanton:
2      Q    Sir, I have shown to your counsel and
3  she has now given to you documents bearing Bates
4  labeled, Plaintiffs produced Bates label 2 through
5  801.  These were -- I will represent to you, I
6  think your counsel can concur, these are documents
7  produced by your counsel to Rogers & Hollands
8  during the course of discovery.
9          You can review them however much time
10  you want.  And the question will be for you, one,
11  first, have you seen any of these documents before.
12  Okay.  So why don't you go ahead and review them.
13  However you want to review them.
14      A    Yes, I have seen some of these.
15      Q    Okay.  Did you produce any of those
16  documents 2 through 801 to your counsel?
17      A    No.
18      Q    So you have only seen them because your
19  counsel showed them to you, correct?
20      A    Correct.
21      Q    Do you have any personal knowledge that
22  anyone at Rogers & Hollands received any of the
23  documents in 2 through 801?
24      A    Not to my knowledge.

                                              52

1    Q    Prior to your receiving them from
2  counsel, you had never seen them, correct?
3    A    Correct.
4    Q    Now, in your complaint -- if you would
5  flip to Exhibit 2, which is your first amended
6  complaint. This is the complaint you authorized to
7  be filed in July of '08. Paragraph 33 on page 6,
8  you allege that Defendant, Rogers and Hollands,
9  knew or should have known of the truncation
10  requirement.
11        What's your basis for that allegation?
12    A    Well, they are producing credit card
13  numbers and they should be held responsible for
14  that.
15    Q    Anything else?
16    A    It's their job as a retailer to protect
17  us consumers.
18    Q    Anything else?
19    A    No.
20    Q    Paragraph 68 you allege defendants,
21  that's Rogers & Hollands, willfully disregarded
22  FACTA's requirements and continued to use cash
23  registers and other machines or devices that print
24  receipts in violation of FACTA.

53

1        What is your basis for the statement
2  that defendants acted willfully?
3    A    That's actually just part of the law.
4    Q    Do you understand what willfully means?
5  If you don't, that's fine.
6    A    Yes, I do.
7    Q    What does it mean?
8    A    Knowingly doing something.
9    Q    What do you mean by that?
10    A    It's going around in a big circle here.
11  Knowingly doing something.
12    Q    You used the word, sir. Can you explain
13  for me what you mean by that?
14    A    Are you talking about willfully?
15    Q    I asked what willfully meant, what you
16  understood it to mean. You said knowingly. I am
17  asking you what you mean by knowingly?
18    A    Knowingly doing something
19  purposefully.
20    Q    Doing something on purpose?
21    A    Not necessarily -- let me retract that.
22  Not necessarily on purpose. They are doing it, not
23  to harm anybody, but they are doing it.
24    Q    Do you understand that Rogers & Hollands

54

1  needed to know about the law to act willfully?
2    A    Yes.
3    Q    Do you have any evidence that Rogers and
4  Hollands knew about FACTA?
5    A    No, I do not.
6    Q    You understand that if you fail to prove
7  that Rogers and Hollands acted willfully, you will
8  receive no recovery?
9    A    Correct.
10    Q    Do you understand that if someone had --
11  you stated that you purport to represent people
12  that had actual damages. Do you understand that
13  people who had actual damages would merely need to
14  prove that Rogers & Hollands acted negligently, do
15  you understand that?
16    MS. MILLER:  I am going to object. He is
17  obviously not an attorney. We are getting into
18  some legal terms here. He is doing this to the
19  best of his knowledge and understanding of what
20  these words are to a lay person.
21    MR. STANTON:  That's fine.
22  By Mr. Stanton:
23    Q    You can still answer the question.
24    A    No, I don't know.

55

1    Q    In this complaint -- I am not going to
2  have you go through this one by one. Will you
3  review paragraphs 34 through 57. Will you just
4  review those.
5        My question is, just to be clear, I am
6  pretty sure I know the answer, is that you have no
7  personal knowledge of any of the information
8  alleged in those paragraphs, correct?
9    A    Correct.
10    Q    I am sorry if I already asked this, I
11  apologize. You have no personal knowledge
12  whatsoever regarding Rogers & Hollands alleged --
13  strike that.
14        You have no personal knowledge
15  regarding -- of any facts other than your receipt
16  of a credit card receipt of Roger & Hollands'
17  alleged willfulness in violating FACTA, correct.
18    A    Would you repeat that?
19    MR. STANTON:  Can you read it back. Let's see
20  if I did okay.
21    (The record was read.)
22    MS. MILLER:  I am going to object again just
23  based on the fact that he is a lay person and to
24  the extent that willfulness is a legal term, he

56

1 can't testify to that.
2          You can go ahead and answer as best you
3 can.
4    THE WITNESS: Not to my knowledge.
5 By Mr. Stanton:
6    Q    Okay. Since you filed the lawsuit
7 against Rogers & Hollands in January 2008, how
8 often have you communicated with your attorneys?
9    A    Roughly, probably once or twice a month,
10 usually either I receive a phone call or I talk to
11 them or I receive an update on the case through
12 U.S. Mail.
13    Q    Okay. Do you participate in making
14 decisions relating to the lawsuit?
15    A    Yes.
16    Q    Like what?
17    A    Like the amended part of this class
18 action suit or to get it to a class action suit.
19    Q    Okay. Just so we are -- for
20 completeness, I am going to show you your discovery
21 answers.
22          (Documents were marked as Woods
23           Deposition Exhibit Nos. 9 and 10
24           for identification.)
57

1 By Mr. Stanton:
2    Q    Sir, the court reporter has marked as
3 Exhibits 9 and 10, 9 being Plaintiff's Supplemental
4 Response to Defendant's First Set of Discovery
5 Requests, and 10 being Plaintiff's Response to
6 Defendant's discovery request.
7          Sir, do you recognize Exhibits 9 and 10?
8    A    Yes, I do.
9    Q    Did you review them before they were
10 sent to my office?
11    A    Yes.
12    Q    Did you make any changes to the
13 documents?
14    A    No.
15    Q    So you received a draft from Ms. Miller
16 and said okay and they were filed?
17    A    Yes.
18    Q    Sir, in Exhibit 9, the supplemental
19 response, on page 802, in the back -- when I say
20 page 802, it's called the privilege log. Do you
21 see that, sir?
22    A    Yes, I do.
23    Q    This is just to refresh your
24 recollection. On 12/7/07, it appears to me that
58

1 Steven Plato Troy -- that's your stepfather?
2    A    Yes.
3    Q    -- sent a fax to Edelman & Combs?
4    A    Correct.
5    Q    Were you aware that Mr. Troy sent a fax
6 to Edelman & Combs on December 7, '07?
7    A    Yes, I was.
8    Q    Did you see a copy of it?
9    A    Yes.
10    Q    On the 12th looks like Mr. Troy sent
11 another fax to Edelman & Combs?
12    A    Yes.
13    Q    Were you aware of the contents of that
14 fax?
15    A    Yes, I was.
16    Q    Did you consult with any other law firms
17 other than Edelman & Combs?
18    A    No.
19    Q    What's your goal in this litigation?
20    A    Making sure that -- as being head of the
21 class, making sure that people that are filing --
22 are protected as far as consumers go. Making sure
23 nothing such as identity theft happens to other
24 people, including myself.
59

1    Q    Your understanding is that at least as
2 of February 8, 2008, Rogers & Hollands has already
3 stopped whatever practice you have alleged violated
4 FACTA, correct?
5    A    From a receipt I received, yes.
6    Q    You are not aware of any failure to
7 comply with FACTA by Rogers & Hollands since that
8 date, are you?
9    A    No, I'm not.
10    Q    Any other goals you have for the
11 litigation? You already in some respects have
12 achieved your goal; is that correct?
13    A    Has anybody been helped below me,
14 as far as people that have had problems with this?
15    Q    Are you aware of anybody having
16 problems?
17    A    No, I'm not but I'm sure -- I don't
18 know for a fact that there was, but there could
19 be.
20    Q    Okay. Is money your goal?
21    A    No. Yes and no I guess you should
22 say.
23    Q    You are trying to get the practice
24 stopped, that's stopped, correct?
60

1    A    Yes.
2    Q    You are still in the lawsuit.  So what
3  else is there?
4    A    Monetary.
5    Q    Okay.  We have sort of touched on this.
6  What do you understand your obligations to the
7  other class members to be, if there is a class
8  certified?
9    A    I believe I already answered that.
10   Q    Go ahead.
11   A    To protect the consumers, the people
12  that shop at Rogers & Hollands.
13   Q    At the Lombard store or elsewhere?
14   A    Elsewhere.
15   Q    Are you aware that your class action
16  purports to represent only those consumers who made
17  purchases at Lombard, correct?
18   A    I wasn't aware of that.
19   Q    Did you think it was the whole Rogers &
20  Hollands chain?
21   A    Yes, I did.
22   Q    So you don't know why it was only
23  Lombard?
24   A    No, I do not.

61

1    Q    Anyone else?
2    A    Not to my knowledge.
3    Q    Your friends?
4    A    No.
5    Q    No one else knows you are a plaintiff in
6  the lawsuit, other than the people that read the
7  pleadings on line, none of your acquaintances
8  know?
9    A    Correct.
10   Q    Does your employer know?
11   A    Well, he knows now because obviously I
12  had to take a little bit of time off work to be
13  here.
14   Q    Okay.  You have not spoken to anybody
15  else, anybody at Rogers & Hollands about this other
16  than me I guess?
17   A    Correct.
18   MR. STANTON:  Why don't we take a break.  I am
19  almost done.
20        (A recess was had.)
21   By Mr. Stanton:
22   Q    Sir, I am showing you what -- strike
23  that.
24        Sir, in a revised amended notice of

63

1    Q    Do you know if you are entitled to
2  receive anymore compensation than each class
3  member?
4    A    Not to my knowledge.
5    Q    Are you personally aware of any other
6  class members?
7    A    No.
8    Q    You don't know anybody else who has
9  gotten a receipt from Rogers & Hollands in the
10  time period that you purport to represent a
11  class?
12   A    No, I don't.
13   Q    Okay.  Other than this lawsuit, have you
14  discussed this -- the November 2007 receipt with
15  anyone else?
16   A    No.
17   Q    You discussed it with your fiancee,
18  right?
19   A    Yes.
20   Q    You discussed it with Mr. Troy, right?
21   A    Right.
22   Q    You discussed it with your counsel,
23  correct?
24   A    Correct.

62

1  deposition, we requested a copy of the original
2  receipt you received at Rogers & Hollands in
3  November of 2007.  Do you recall that?
4    A    Yes, I do.
5    Q    I am showing you what appears to be
6  two pages, one is a credit card receipt, yellow, it
7  has two sides of print, as well as, sort of a
8  harder cardboard return policy.  Do you see this,
9  sir?
10   A    Yes, I do.
11   Q    Is that the original receipt you
12  received in November of 2007 from Rogers &
13  Hollands?
14   A    Yes, it is.
15   Q    Okay.  Other than the credit card
16  agreement that you previously identified, did you
17  receive anything else from Rogers & Hollands other
18  than the ring that day on November 2007?
19   A    Just the credit, whatever.
20   Q    The agreement.  We already identified.
21   A    Yes.
22   Q    Anything else?
23   A    No.
24   MR. STANTON:  Let's take a quick break.

64

1    (A recess was had.)

2    MR. STANTON: Thank you. That's all I have.

3    MS. MILLER: We have no additional questions.

4 We will reserve signature.

5

6

7    DEPOSITION CONCLUDED

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                                65

---

1   STATE OF ILLINOIS  )
                       )SS:
2   COUNTY OF DU PAGE  )

3

4    I, PEGGY CURRAN, CSR, CRR, License

5 No. 084-002016, notary public within and for the

6 County of DuPage and State of Illinois, do hereby

7 certify that heretofore, to wit, on the 4th day of

8 August, A.D., 2008, CHRISTOPHER WOODS personally

9 appeared before me as a witness in a cause now

10 pending and undetermined in the United States

11 District Court, Northern District of Illinois,

12 Eastern Division, wherein Christopher Woods is

13 plaintiff and Rogers Enterprises, d/b/a Rogers &

14 Hollands Jewelers are Defendants, No. 08 C 49.

15    I further certify that the said

16 CHRISTOPHER WOODS was by me first duly sworn to

17 testify the truth, the whole truth and nothing but

18 the truth in the cause aforesaid before the taking

19 of his deposition; that the testimony given was

20 stenographically recorded in the presence of said

21 witness by me, and afterwards transcribed upon a

22 computer, and that the foregoing is a true and

23 correct transcript of said testimony.

24    I further certify that there were present

                                                67

---

1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

3 CHRISTOPHER WOODS                    )
   individually and on behalf         )
4 of a class,                         )
              Plaintiff,              )
5     vs.                             )No. 08 C 49
                                      )
6 ROGERS ENTERPRISES, INC.,           )
   d/b/a ROGERS & HOLLANDS            )
7 JEWELERS, and DOES 1-10             )
                                      )
8        Defendants.                  )

9

10    I, CHRISTOPHER WOODS, being first duly

11 sworn, on oath, say that I am the deponent in the

12 aforesaid deposition, and that I have read the

13 foregoing transcript of my deposition, consisting

14 of pages 1 through 68, inclusive, taken on

15 August 4, 2008 at the aforesaid place and that the

16 foregoing is a true and correct transcript of my

17 testimony so given.

18            _____ corrections were made

19            _____ no corrections were made

20

21         _____
                 CHRISTOPHER WOODS

22 SUBSCRIBED AND SWORN TO
    before me this _____ day
23 of _____ A.D., 2008.

24 _____
    Notary Public                              66

---

1 at the taking of the deposition the aforementioned

2 counsel.

3    I further certify that I am not counsel

4 for nor in any way related to any of the parties to

5 this suit, nor am I in any way interested in the

6 outcome thereof.

7    In testimony whereof, I have hereunto set

8 my hand and seal this 14th day of August, A.D.,

9 2008.

10

11

12         _____
13              Notary Public
14         DuPage County, Illinois
15         CSR No. 084-002016

16

17         ┌─────────────────────────────┐
             │      OFFICIAL SEAL           │
18         │      PEGGY CURRAN            │
             │ NOTARY PUBLIC - STATE OF ILLINOIS │
19         │ MY COMMISSION EXPIRES:03/03/09 │
             └─────────────────────────────┘

20

21

22

23

24                                              68

CHRISTOPHER WOODS - AUGUST 4, 2008

## $

**$1,000** [4] 26:17 40:5,12 51:14
**$1,799** [1] 29:19
**$1,999** [1] 29:13
**$100** [1] 26:17
**$106** [1] 34:11
**$1500** [1] 32:11
**$2,000** [1] 19:23
**$230** [1] 41:5
**$300** [1] 37:2
**$37,000** [1] 35:7
**$40** [1] 41:5
**$50** [1] 34:4

## )

**)no** [1] 1:6 66:5 69:6

## 0

**07** [1] 59:6
**08** [1] 1:6 22:14 53:7 66:5 67:14 69:6
**084-002016** [2] 67:5 68:15
**084-2016** [1] 1:17

## 1

**1** [4] 4:15 22:8,12 66:13
**1,500** [1] 30:19
**1,799** [1] 29:18
**1-10** [1] 3:1 8 66:7 69:8
**1/5/83** [1] 9:9
**10** [6] 4:15 24:5 57:23 58:3,5,7
**100** [1] 40:12
**1013** [1] 12:9
**10th** [1] 23:14
**119** [1] 35:16
**1193** [1] 33:9
**1195** [1] 33:10
**12/7/07** [1] 58:24
**1200** [1] 37:1
**121** [2] 33:9,21
**123** [1] 34:9
**124** [1] 33:9
**12th** [1] 59:10
**14th** [2] 10:1 68:8
**1500** [1] 36:21
**180** [1] 1:19
**18th** [1] 2:4

## 2

**2** [10] 10:13 23:22 24:3,8,14 25:20 52:4,16,23 53:5
**200** [1] 37:2
**2001** [1] 12:22
**2004** [1] 20:4
**2005** [5] 17:20 19:4,6 20:3,14
**2006** [1] 13:14
**2007** [12] 27:3 29:7 30:4,13 31:13 38:18,23 45:9 62:14 64:3,12,18
**2008** [12] 1:20 21:3 22:18 24:5 34:11 35:19,23 57:7 60:2 66:14 67:8 68:9
**21st** [1] 34:1
**23** [9] 16:10 29:7 30:4,13 31:13 33:

**22** **38**:18,23 45:8
**25** [1] 9:11
**2700** [1] 2:8

## 3

**3** [5] 22:18 28:13,17,19 29:2
**312** [2] 2:5,9
**33** [1] 53:7
**34** [1] 56:3
**3rd** [1] 21:3

## 4

**4** [8] 1:20 3:6 31:2,5,6,9,24 66:14
**49** [5] 1:6 22:14 66:5 67:14 69:6
**4th** [1] 67:7

## 5

**5** [5] 31:2,6 32:4,4,6
**524** [1] 11:1
**57** [1] 56:3

## 6

**6** [4] 33:2,6,12 53:7
**627-4600** [1] 2:9
**68** [2] 53:20 66:13

## 7

**7** [3] 35:11,15 59:6
**733** [1] 10:13
**739-4200** [1] 2:5

## 8

**8** [6] 47:15,19,21,23 49:21 60:2
**801** [3] 52:5,16,23
**802** [2] 58:19,20
**803** [1] 47:20
**805** [2] 47:20,24

## 9

**9** [5] 57:23 58:3,3,7,18
**9:30** [1] 1:21

## A

**a.d** [2] 67:8 68:8
**a.m** [1] 1:21
**aa** [1] 18:23
**able** [5] 5:19 7:15 17:9 35:3 41:3
**absolutely** [1] 16:7
**abuse** [1] 18:11
**accept** [1] 50:23
**accordance** [1] 1:12
**according** [1] 26:5
**account** [2] 31:7 32:5
**accurate** [1] 31:21
**achieved** [1] 60:12
**acquaintances** [1] 63:7
**act** [1] 55:1
**acted** [3] 54:2 55:7,14
**action** [5] 24:5,13 44:18,21 45:2 57:18,18 61:15
**actual** [10] 50:3,8,13,17 51:7,10,13, 14 55:12,13
**actually** [6] 11:15 13:13 27:21 37:9 51:18 54:3
**atiddition** [1] 5:15

**additional** [1] 65:3
**address** [3] 10:12 11:10,12
**adhered** [1] 34:24
**administration** [1] 13:16
**advertisement** [1] 44:23
**advise** [4] 38:19 39:2,6 40:6
**advised** [2] 43:15 49:14
**advising** [1] 38:10
**affect** [2] 7:7,18
**aforementioned** [1] 68:1
**aforesaid** [2] 66:11,14 67:18
**afterwards** [2] 14:23 67:21
**ago** [1] 8:5
**agreement** [7] 32:6 34:24 47:11 48:6,17 64:16,20
**agreements** [1] 49:20
**ahead** [3] 52:12 57:2 61:10
**alcohol** [2] 7:12 18:11
**alcoholic** [1] 18:19
**allegation** [2] 26:12 53:11
**allege** [2] 53:8,20
**alleged** [5] 34:21 56:8,12,17 60:3
**allowed** [2] 38:6,6
**almost** [1] 63:19
**alone** [2] 11:5,7
**already** [7] 5:6 42:21 56:10 60:2,11 61:9 64:20
**amended** [7] 23:16 24:4,18 25:3, 14 26:4,5,16 53:5 57:17 63:24
**amending** [1] 24:13
**amount** [1] 30:16
**anniversary** [1] 23:14
**another** [6] 6:2 17:5 37:7 59:11
**answer** [6] 5:21 6:8 23:2 55:23 56:6 57:2
**answered** [1] 61:9
**answers** [3] 8:13 16:5 57:21
**anticipating** [1] 14:7
**anybody** [8] 39:2 51:19 54:23 60: 13,15 62:8 63:14,15
**apartment** [1] 11:2
**apologize** [3] 10:14 35:14 56:11
**appear** [2] 33:6 34:24
**appearances** [1] 2:1
**appeared** [1] 67:9
**appears** [9] 29:6 31:7 32:5 33:21 34:10 35:18 47:19 58:24 64:5
**appliances** [1] 14:19
**applicable** [1] 1:13
**application** [6] 30:14,21 31:8,11, 12,24
**applied** [3] 28:6 30:2 32:7
**apply** [1] 30:6
**applying** [2] 30:12 41:21
**approved** [1] 30:15
**around** [4] 37:1 45:24 46:1 54:10
**arrest** [4] 17:24 19:4,15 20:2
**arrested** [1] 17:15
**articles** [1] 44:2
**associate** [2] 31:18 43:14
**assume** [2] 6:16 20:14
**attend** [2] 17:9 18:23

**attended** [1] 11:15
**attorney** [1] 55:17
**attorney-client** [1] 25:1
**attorneys** [1] 57:8
**august** [4] 1:20 66:14 67:8 68:8
**authorize** [1] 22:4
**authorized** [2] 22:16 53:6
**available** [1] 37:3
**avenue** [1] 11:11
**aware** [13] 23:16 41:13,23 43:5,7 49:7 59:5,13 60:6,15 61:15,18 62:5

## B

**back** [2] 56:19 58:19
**bad** [2] 6:5 35:16
**balance** [2] 32:23 36:23
**bankruptcy** [1] 44:15
**based** [2] 21:22 56:23
**basically** [5] 15:4,24 24:12 38:5
**basis** [2] 53:11 54:1
**bates** [6] 33:9 34:9 35:15 47:24 52: 3,4
**bearing** [4] 22:13 35:15 47:23 52:3
**bears** [1] 29:6
**become** [1] 9:24
**behalf** [2] 20:22 22:16
**believe** [10] 23:15 26:18 30:19 37:1 39:20 40:21 43:20,21 50:24 61:9
**below** [1] 60:13
**benefit** [1] 50:24
**best** [10] 5:11 6:6,6,9 23:2,4 25:23 43:21 55:19 57:2
**better** [2] 15:19 45:7
**between** [2] 32:13 48:17
**big** [1] 54:10
**bill** [2] 40:20 41:6
**bills** [2] 32:19 33:16
**birth** [1] 9:8
**birthday** [1] 41:20
**bit** [5] 9:6,20 45:23 51:18 63:12
**bonus** [1] 35:8
**both** [2] 14:23 29:20
**bottom** [2] 28:21 48:2
**bought** [5] 9:16 27:4 29:9 38:24 45: 8
**break** [4] 5:18 26:8 63:18 64:24
**bring** [1] 8:21
**brookside** [1] 11:1
**brought** [1] 40:1
**business** [3] 4:14 13:16 15:20
**buy** [1] 41:10

## C

**call** [1] 57:10
**called** [4] 1:12 4:3 14:5 58:20
**came** [3] 8:16 40:20 41:6
**captioned** [1] 4:13
**card** [40] 26:6,21 28:1,2,4,19 29:4, 20,23 30:3,7,12 32:14,17 33:8,17 35:17,22 36:6,9,14,17,18,19 37:8,7 40:15 41:1,3,14 42:1,2,13 43:11,19 50:5 51:20 53:12 56:16 64:6,15
**cardboard** [1] 64:8

CHRISTOPHER WOODS - AUGUST 4, 2008

cards [1] 41:21
careful [2] 9:23 11:23
carpenter [1] 14:21
cars [1] 41:22
case [8] 7:23 8:6,7 9:4 17:7 22:13 43:8 57:11
cases [1] 39:19
cash [1] 53:22
cassandra [7] 4:21 8:1 21:6 24:20 28:8 46:9,11
cathleen [2] 46:18 48:3
cause [2] 67:9,18
caused [1] 19:14
caution [1] 24:22
certain [3] 30:16,16 38:7
certified [4] 40:11 50:8,11 61:8
certify [4] 67:7,15,24 68:3
chain [1] 61:20
change [7] 69:15,20 70:1,6,11,16, 20
changed [1] 36:14
changes [2] 58:12 69:11
charge [2] 19:9 20:7
check [1] 36:5
cherokee [1] 12:9
chicago [1] 1:19
children [1] 10:8
christmas [1] 23:8
christopher [16] 1:3,11 3:4 4:2,11, 13,17 20:16 68:3,9 67:8,12,16 69:3, 24 70:24
circle [1] 54:10
circumstances [1] 19:11
cities [2] 15:22 16:1
citizens [1] 16:1
city [1] 16:2
civil [1] 1:14 4:12
claim [3] 26:2 40:1 50:19
claiming [2] 50:2 51:19
claims [1] 50:1
class [26] 1:4 22:13 24:4,13 40:6,10, 10 44:17,21 45:2 50:7,11,16,21 51: 11 57:17,18 59:21 61:7,7,15 62:2,6, 11 66:4 69:4
classified [1] 14:24
clear [1] 56:5
client [1] 48:21
clients [2] 15:12 40:16
cod [1] 13:5
college [15] 11:11,13,14,15 12:1,23, 24 13:1,2,5,7,10,19,24 14:21
combs [25] 2:3 4:21 22:1 39:11,15, 18 45:22 46:6,11,18 47:1,2,8,12 48: 3,7,10,18,24 49:6,21 59:3,6,11,17
come [2] 26:23 38:9
commencing [1] 1:20
commit [3] 42:13 43:1,10
common [1] 15:22
communicate [2] 5:12,13
communicated [1] 57:8
communications [1] 24:23
companies [1] 38:6

company [3] 14:5 15:15 37:14
compensation [3] 39:14,22 62:2
complaint [28] 20:21 21:2,13,19 1:5,13,15,20 23:17 24:4,19 25:3, 14 26:4,4,5,16 34:21 36:13 39:6 41: 16 42:8 51:6 53:4,6,6 56:1
complaints [1] 34:16
completeness [1] 57:20
comply [2] 45:10 60:7
computer [1] 67:22
computers [1] 15:12
concluded [1] 65:7
concur [1] 52:6
confidential [1] 9:2
congratulations [2] 9:14 10:18
connection [1] 30:21
consent [1] 28:8
considered [1] 25:1
consisting [1] 66:12
consult [1] 59:16
consumers [5] 51:1 53:17 59:22 61:11,16
contents [3] 22:1 33:11 59:13
continued [1] 53:22
convicted [2] 17:24 18:2
coordinator [1] 16:18
copy [7] 21:10 31:12 32:5,6 48:6 59: 8 64:1
corporate [5] 15:8,9 16:13,14,15
correct [34] 16:7 20:20 21:11,22 25: 6,17 23:18 25:13 26:10,11 27:8 29: 7,11,13 30:1,4,5 32:12,15,21 33:22 34:1,5,6,11,12 35:1,2 36:1,15,22 37: 4,7,8,12,17,18 41:8,11,12 42:23 43: 16,17 44:1 45:11,12 47:9,10 48:1, 14 51:4,5,7,8,15,16,21,22 52:19,20 53:2,3 55:9 56:8,9,17 59:4 60:4,12, 24 61:17 62:23,24 63:9,17 66:15 67:23
corrections [2] 66:17,18
cost [1] 49:4
costs [5] 20:11 49:9,12,15,18
couldn't [3] 37:6 41:9 43:20
counsel [7] 4:18 5:5 8:18 48:16 52:2,6,7,16,19 53:2 62:22 68:2,3
county [3] 1:18 18:7 67:2,6 68:14
couple [2] 11:24 44:5
course [1] 52:8
court [18] 1:1 5:2,8,9 6:4 20:11 22: 11 24:2,6 28:16 31:5 33:5 35:14 47: 18 58:2 66:1 67:11 69:11
courts [1] 1:15
credit [45] 26:6,21 28:1,2,4,18 29:4 30:3,12,16,17,23 31:7,11,12 32:5,7, 11,17 33:7,17 34:20,24 35:16 36:5, 9,14,17,18 37:3,6,18 38:7 41:1,3,21,24 42:2 43:19 50:4 51:20 53:12 56:16 64:6,15,19
crr [1] 67:4
csr [1] 1:16 67:4 68:15
curran [1] 1:16 67:4
current [2] 15:6 36:23

currently [3] 10:10 16:10 49:16
customers [1] 37:16
cut [2] 6:3 11:23
cutting [1] 21:14

## D

d/b/a [1] 67:13
damages [26] 26:15,20 39:24 50:3, 8,9,13,18 51:7,10,13,15 55:12,13
dan [1] 46:20
darien [2] 12:10 14:15
date [6] 9:8 22:24 25:8,17 29:6 60:8
day [13] 6:24 18:15,17 22:23 28:5 29:9,19 36:8 45:18 64:18 66:22 67: 7 68:8
days [1] 17:11
deal [4] 15:12,13,17 49:3
dealings [1] 47:4
deals [1] 15:11
december [7] 10:1 13:13 23:3 33: 24 34:1 45:24 59:6
decision [1] 50:22
decisions [1] 57:14
defaulted [1] 44:13
defendant [1] 53:8
defendant's [2] 58:4,6
defendants [7] 1:9,12 53:20 54:2 66:8 67:14 69:9
definition [1] 41:22
degree [3] 13:15,20,21
deponent [1] 66:10
deposition [23] 1:11 4:10,23 5:7 7: 22 8:11,16,20 22:8,12 23:22 28:13 31:2 33:2 35:11 47:15 57:23 64:1 65:7 66:11,12 67:19 68:1
depositions [1] 1:15
depression [1] 6:22
describe [1] 30:11
devices [1] 53:23
diamond [5] 27:22,23 34:13 35:23 40:18
different [1] 41:21
difficult [1] 6:4
digit [1] 42:1
digits [6] 26:6,10 38:7 41:2 42:11, 12 43:1,11
director [1] 17:1
disclaimers [1] 30:23
discovery [6] 7:23 8:12 52:8 57:20 58:4,6
discussed [4] 62:14,17,20,22
discussion [3] 46:5 51:4,24
disposition [1] 17:23 20:9
disregarded [1] 53:21
district [6] 1:1,14 24:6,7 66:1 67:11, 11 69:1
division [4] 1:2 66:2 67:12 69:2
document [9] 22:7 23:21 28:12 33: 1 35:10,15 47:14,19 48:12
documentation [1] 30:20
documents [16] 8:1,4,7,10,15,16 31:1 33:6,13 52:3,6,11,16,23 57:22 58:13

doing [11] 4:14 19:13 21:15 24:12 54:8,11,18,20,22,23 55:18
done [2] 5:8 63:19
dorms [1] 12:3
down [3] 5:8,10 51:18
downers [1] 10:11
draft [1] 58:15
drive [2] 11:1 12:9
driver's [3] 31:16,17 41:20
driving [1] 19:10,15,18,20
du [1] 67:2
dui [4] 17:22 18:1 19:17 20:8
duly [4] 4:1,3 66:9 67:16
dupage [5] 1:18 13:7 18:7 67:6 68: 14
during [2] 30:3 52:8
dykema [1] 2:7

## E

e-mailed [1] 21:16
each [3] 9:3 9:22 21:14 32:19 62:2
earlier [1] 49:24
eastern [4] 1:2 66:2 67:12 69:2
edelman [22] 2:3 4:21 22:21 39:11, 14,18 45:22 46:6,11,20 47:1,1,7,12 48:18,24 49:6,21 59:3,6,11,17
education [1] 13:23
eight [7] 41:2 42:1,10,12,16 43:1,11
either [2] 8:16 57:10
elmhurst [6] 11:14,22 12:23 13:1 14:21 17:22
elsewhere [2] 61:13,14
employed [3] 14:2,12 16:8
employer [1] 63:10
engaged [6] 9:13,14,15,24 23:10, 11
engagement [4] 27:7 29:10 45:8 46:2
entered [1] 9:3
enterprises [3] 1:7 4:8,14 66:6 67: 13 69:7
entitled [1] 62:1
entitlement [1] 26:20
establish [1] 26:20
everything [2] 21:19 34:23
evidence [1] 55:3
exact [1] 11:12
exactly [2] 8:8 22:24
examination [2] 3:5 4:5
examined [1] 4:4
excess [1] 51:13
exhibit [31] 22:8,12 23:22 24:3,8,14 25:20 28:13,17,19 29:2 31:2,6,9,24 32:4,4,6 33:2,6,12 35:11,15 47:15, 19,21,23 49:21 53:5 57:23 58:18
exhibits [3] 31:5 58:3,7
expenses [1] 48:19
experience [6] 8:16 39:18
expert [2] 42:15 43:8
expiration [1] 25:17
explain [2] 5:4 54:12
explained [1] 15:6
extent [1] 56:24

CHRISTOPHER WOODS - AUGUST 4, 2008

## F

fact [3] 42:10 56:23 60:18
facta [15] 26:7,13 37:19,21 38:4,20
  43:16,24 44:2 45:10 53:24 55:4 56:
  17 60:4,7
facta's [1] 53:22
facts [2] 5:17 56:15
fail [1] 55:6
failure [3] 39:7 50:4 60:6
fair [2] 6:14 28:10
familiar [1] 20:21
faq [1] 15:22
far [12] 15:12,12 19:12 21:15,20,24
  30:23 36:12 41:18 48:20 59:22 60:
  14
faster [1] 51:17
fax [4] 59:3,5,11,14
fax'd [1] 21:16
february [3] 13:14 34:10 35:18,23
  60:2
federal [2] 1:13 4:12
few [1] 5:4
fiancee [3] 10:20 13:19 62:17
fiancee's [1] 10:2
figure [1] 41:3
figured [1] 50:23
file [1] 25:8
filed [10] 20:22,24 21:2 22:18,22 23:
  17 24:5,15,19 25:5,12,15,21 44:15
  53:7 57:6 58:16
filing [7] 22:4,16,20 25:3 36:13 39:5
  59:21
fill [1] 30:14
filled [3] 31:12,14,18
financing [1] 30:8
find [1] 42:6
fine [7] 5:19 13:9 19:21,22 28:11 54:
  5 55:21
fines [1] 20:11
finish [2] 6:7 38:16
firm [11] 39:11,15,18 45:22 46:6 47:
  2,8 48:18 49:6,22
firms [1] 59:16
first [15] 4:3 5:21 13:5 17:17 24:4
  27:3 33:20 46:4,5 50:1 52:11 53:5
  58:4 66:9 67:16
five [2] 26:6,9
flip [2] 34:9 53:5
floor [1] 2:4
follows [2] 4:4 69:12
foregoing [3] 62:12,15 67:22
forgot [1] 16:12
four [2] 14:17 37:11
frame [1] 45:24
fraudulently [3] 37:6 40:19 51:21
frequently [1] 15:23
friday [1] 23:15
friends [1] 63:3
further [3] 67:15,24 68:3

## G

gave [1] 31:15

## general column

general [1] 48:16
generally [2] 24:24 40:13
getting [1] 55:17
give [3] 19:14 22:19 43:9
given [8] 28:17 30:20 32:11 52:3 66:
  16 67:19
goal [3] 59:19 60:12,20
goals [1] 60:10
goods [2] 43:2 44:24
goodwin [3] 2:3 48:18 49:1
got [6] 16:17,18 19:16 23:10,10 44:
  20
gotten [2] 44:17 62:9
government [1] 15:17
governments [1] 15:16
graduate [2] 12:16 13:9
graduated [1] 13:24
grove [1] 10:11
guess [7] 23:4 24:17 29:13 41:4 50:
  22 60:21 63:16
guy [1] 46:12
guys [1] 8:13

## H

half [1] 8:5
hand [1] 68:8
handed [2] 24:2 31:6
happens [1] 59:23
harder [1] 64:8
harm [1] 54:23
head [5] 24:16 25:7 50:21 51:11 59:
  20
headlight [1] 19:17
heard [2] 43:24 47:1
held [1] 53:13
help [1] 25:5
helped [1] 60:13
hereby [1] 67:6
herein [1] 4:3
heretofore [1] 67:7
hereunto [1] 68:7
high [1] 12:16
hinsdale [2] 12:20 18:15
hire [1] 47:7
hollands [14] 4:9,15 20:18 26:3,9
  27:4,13,24 28:2,3 29:5 30:3,7,12
  31:8,13,18 32:8,14,17,20 33:7,17
  34:17,20 35:22 36:8,14,18,19 37:6
  38:14,18,23 39:6 40:2,15,18 41:4,6,
  10,14,24 42:1,13,19 43:1,3,11 49:8
  51:20 52:7,22 53:8,21 54:24 55:4,7,
  14 56:12 57:7 60:2,7 61:12,20 62:9
  63:15 64:2,13,17 67:14
hollands' [2] 50:4 56:16
home [3] 12:5 21:8 48:8
honestly [1] 49:2
hospital [1] 18:15
hour [1] 1:20
house [1] 28:1
however [2] 52:9,13
humans [2] 5:12 6:2

## I

idea [1] 39:23
identification [8] 22:9 23:23 28:14
  31:3 33:3 35:12 47:16 57:24
identified [2] 64:16,20
identify [2] 23:20 29:2
identity [7] 41:17 42:2,14,15 43:2,
  10 59:23
illinois [7] 1:18,19 24:7 67:1,6,11
  68:14
illnesses [1] 7:10
imbibed [1] 7:12
implementation [1] 16:17
importance [1] 23:15
in-house [1] 29:23
inaccurate [1] 31:24
inc [4] 1:7 4:14 66:6 69:7
including [1] 59:24
inclusive [1] 66:13
information [3] 31:15 41:19 56:7
instance [1] 31:16
interested [1] 68:5
internet [1] 42:18
interrupting [1] 9:22
introduced [1] 46:24
iowa [1] 13:22

## J

jail [1] 18:8
january [4] 21:2,3 22:18 57:7
jewelers [5] 1:8 4:15 66:7 67:14 69:
  8
jim [1] 46:22
job [4] 14:20 15:6 51:1 53:16
john [1] 4:15
joined [1] 16:11
joliet [1] 38:2
jonathan [1] 46:13
journeyman [1] 15:2
july [2] 24:5 53:7
june [3] 14:10,11 16:12

## K

kind [3] 6:21 27:21 50:21
knowingly [5] 54:8,11,16,17,18
knowledge [16] 21:23 25:24 32:1
  40:12 43:21 46:17 48:23 52:21,24
  55:19 56:7,11,14 57:4 62:4 63:2
known [2] 4:9 53:9
knows [2] 63:5,11

## L

label [1] 52:4
labeled [2] 33:9 52:4
labels [1] 47:20
lands [1] 39:7
lasalle [1] 1:19
last [6] 9:17 10:4,23 14:9,11 16:11
later [4] 9:6,20 45:19,19
latturner [4] 2:3 46:22 48:18,24
law [7] 25:16 26:7 48:18 49:6 54:3
  55:1 59:16
lawsuit [8] 47:8 49:5,8 57:6,14 61:
  2 62:13 63:6

## lawsuits column

lawsuits [2] 44:6,8
lawyer [6] 8:9 22:2,3 24:24 26:23
  37:22
lay [2] 55:20 56:23
learn [1] 37:21
learned [1] 37:19
least [4] 28:18 31:12 36:13 60:1
left [2] 17:10 46:14
legal [2] 55:18 56:24
less [2] 45:20 51:14
level [1] 30:18
liable [2] 42:22 49:12
license [5] 1:16 31:16,17 41:20 67:
  4
likely [2] 5:19 49:9
limit [1] 36:21
line [10] 30:16 32:11 37:3 48:3 63:7
  69:14,19 70:5,10,15
list [4] 4:22 29:17
litigation [2] 59:19 60:11
little [7] 9:6,20 30:22 45:7,23 51:18
  63:12
live [9] 10:10,11,18,24 11:3,5,8,17
  12:11
lived [4] 11:9,15 12:5,14
llc [2] 2:3
loans [1] 44:13
log [1] 58:20
lombard [4] 19:8 61:13,17,23
long [6] 9:15 11:3 14:8,16 18:21 45:
  19
longer [1] 45:21
looking [1] 24:23
looks [3] 29:12 34:3 59:10
lot [1] 15:16
lynn [1] 32:2

## M

m-u-n-d-i-e [1] 10:7
machines [1] 53:23
made [9] 26:3 27:17 35:21 36:3 38:
  13,17 61:16 66:17,18
mail [2] 21:18 57:12
mailed [1] 21:17
mailing [1] 44:20
mainly [1] 16:15
maker [1] 36:6
many [6] 16:8,22 17:17 27:12
marked [18] 9:2 22:7,12 23:21 24:3
  28:12,16,17 31:1,5 33:1,5 35:10,15
  47:14,18 57:22 58:2
married [1] 9:12
mastercard [4] 29:21,22,23 32:14
matter [2] 4:12 20:17
mean [5] 54:7,9,13,16,17
means [1] 54:4
meant [2] 5:15 54:15
medications [6] 6:19 7:3
meet [1] 46:4
meeting [1] 46:5
member [2] 45:5 62:3
members [3] 16:2 61:7 62:6
memory [2] 7:8,19

CHRISTOPHER WOODS - AUGUST 4, 2008

mentioned [2] 12:23 38:11
merchandise [2] 34:17 41:5
merely [1] 55:13
messages [1] 46:14
met [1] 46:18
method [1] 5:7
middle [2] 23:3 45:23
miller [4] 4:21 8:1,22 9:1 21:6 23:
    2 28:11 46:9,11 55:16 56:22 58:15
    65:3
miller's [1] 21:7
missed [1] 34:7
misunderstood [1] 6:15
moment [1] 24:23
monday [1] 1:20
monetary [1] 61:4
money [1] 60:20
month [4] 22:23 32:19 34:4 57:9
monthly [1] 36:3
months [2] 14:17 37:11
morning [1] 4:7
most [3] 17:19,20 19:5
mother [1] 32:3
moved [1] 14:21 12:13
ms [11] 8:22 9:1 21:7 23:2 28:11 48:
    7,10 55:16 56:22 58:15 65:3
much [7] 17:3 19:22 35:6 45:18,21
    49:14 52:9
mundie [1] 10:5
myself [1] 59:24

N

name [7] 4:7,16 10:2,4 37:23 42:5,8
named [1] 46:13
naperville [1] 20:6
necessarily [2] 54:21,22
necessary [1] 17:14
necklace [1] 27:22,23
need [5] 5:18 26:19 55:13
needed [1] 55:1
negligently [1] 55:14
negotiating [1] 29:19
networking [1] 15:11
never [4] 43:24 44:2,20 53:2
new [2] 18:15,17
newspaper [1] 44:24
next [2] 10:15 19:5
none [1] 63:7
nor [2] 68:4,5
normally [1] 5:12
north [1] 1:19
northern [2] 24:6 67:11
nos [2] 31:2 57:23
notary [3] 1:17 67:5 68:13
nothing [2] 59:23 67:17
notice [5] 8:20 38:23 44:17,23 63:
    24
november [18] 9:17 17:20 18:22
    19:4 20:4 27:3 29:7 30:4,13 31:13
    33:22 38:18,23 45:8 62:14 64:3,12,
    18
number [15] 26:6 31:19 38:7,8 40:
    17,19 41:3,10,19,20 42:1,2,6 43:12

51:20
numbers [5] 36:6 39:8 42:17 43:19
    53:13

O

oath [1] 66:10
object [2] 55:16 56:22
obligations [1] 61:6
obvious [1] 32:10
obviously [2] 55:17 63:11
october [3] 19:6 20:3,14
offered [1] 51:2
office [3] 8:17 21:7 58:10
officer [1] 19:14
often [3] 6:3,23 57:8
okay [26] 6:9,12,17 7:21 8:10,14 9:5
    16:8 17:21 19:9 35:21 46:1,4 49:7
    52:12,15 56:20 57:6,13,19 58:16
    60:20 61:5 62:13 63:14 64:15
once [4] 6:24 27:14 50:22 57:9
one [16] 5:19 11:4 12:2,3 19:5 25:11
    28:18 40:15,16 45:4 50:21 52:10
    56:2,2 63:5 64:6
only [5] 38:5,6 52:18 61:16,22
operations [1] 17:2
opinion [1] 43:9
orally [1] 5:13
order [2] 9:3 26:19
original [4] 8:21 28:10 64:1,11
originally [2] 19:16,17
other [35] 6:3 7:3,10 9:22 11:24 17:
    24 20:2 21:14 25:11 34:19,20 36:
    19 37:13 39:5 42:24 43:2 44:6,8 46:
    11 49:20,21 50:24 53:23 56:15 59:
    16,17,23 60:10 61:7 62:5,13 63:6,
    15 64:15,17
others [1] 11:18
out [10] 12:13 16:16 19:17 26:8 30:
    14 31:13,14 41:3 42:6 50:23
outcome [1] 68:6
outlet [1] 14:13
over [6] 7:23 14:9 19:16 21:9 28:10
    42:17
own [3] 10:15,17,19

P

page [13] 3:3 33:20 47:19,23 53:7
    58:19,20 67:2 69:14,19 70:5,10,15
pages [1] 15:22 64:6 66:13
paid [2] 32:22 49:1
pamphlets [1] 30:22
paragraph [2] 53:7,20
paragraphs [2] 56:3,8
pardon [1] 51:17
parents [1] 12:6
part [3] 13:5 44:18 45:2 54:3 57:17
participate [1] 57:13
particular [1] 13:17
parties [1] 68:4
party [2] 44:6,8
passed [1] 26:16
past [2] 39:17,20
patrick [1] 4:7

pause [1] 6:8
pay [4] 27:23 40:20 41:7 49:17
paying [1] 34:3
payment [2] 33:16,24 35:4
payments [1] 34:7
pays [1] 49:4
peggy [1] 1:16 67:4
pendant [2] 34:13 35:23
pending [2] 5:20 67:10
people [14] 16:8,22 50:8,12,16,17
    51:9 55:11,13 59:21,24 60:14 61:
    11 63:6
percent [1] 30:8
period [2] 45:1 62:10
person [4] 46:6 55:20 56:23
personal [7] 17:6,11 21:22 52:21
    56:7,11,14
personally [2] 62:5 67:8
pertaining [1] 1:15
phone [5] 21:9,10 46:6,7 57:10
photocopy [3] 28:8,18 35:16
physician [1] 7:1
place [2] 10:16 66:14
plaintiff [6] 1:5 20:17 49:9 63:5 67:
    13 69:5
plaintiff's [3] 24:4 58:3,5
plaintiffs [1] 52:4
plato [1] 59:1
play [1] 26:24
plea [2] 18:4,5
pleaded [1] 20:15
pleadings [1] 63:7
please [4] 4:16 5:23 30:13
pled [1] 20:12
plus [1] 17:10
point [3] 22:19 23:13 43:9
police [1] 19:14
policy [1] 64:8
portions [1] 48:15
positive [1] 48:11
pothole [1] 16:3
practice [3] 38:1 60:3,23
practices [1] 38:2
preparation [2] 8:11,15
prepare [1] 7:21
prescribed [1] 17:1
presence [1] 67:20
present [1] 67:22
pretty [1] 56:6
previous [2] 12:4 20:2
previously [2] 38:12 64:16
price [3] 29:12,17,18
print [2] 53:23 64:7
prior [2] 20:2 53:1
privilege [2] 25:2 58:20
probably [7] 8:5 21:5 23:3 32:10
    45:20,23 57:9
problems [3] 34:19 60:14,16
procedure [2] 1:14 4:12
proceeding [3] 5:5 48:20 49:4
process [2] 30:11 34:20
processed [1] 30:15

produce [1] 52:15
produced [3] 8:17 52:4,7
producing [1] 53:12
product [1] 15:24
productive [1] 51:12
program [2] 18:16
promoted [2] 16:17,18
proposed [1] 9:20
protect [2] 53:16 61:11
protected [1] 59:22
protective [1] 9:3
prove [3] 26:19 55:6,14
provisions [1] 1:13
psychology [1] 13:21
public [3] 1:17 67:5 68:13
pulled [1] 19:16
purchase [12] 27:17,20 33:21 34:
    11 35:18 36:3 38:13,17 40:18 42:
    17,22 44:24
purchased [5] 27:21 28:5 35:23 41:
    4 45:9
purchases [1] 61:17
purchasing [2] 41:21 43:2
purport [9] 50:7 55:11 62:10
purports [2] 24:3 61:16
purpose [2] 54:20,22
purposefully [1] 54:19
pursuant [2] 4:11 9:2
put [4] 16:1 30:9 35:22 38:6

Q

q-a [1] 14:5
qa [7] 14:5,8 15:7,20 16:9,11 17:4
question [14] 5:20,21,23 6:12,15,
    16 10:15 15:19,21 16:5 38:16 52:
    10 55:23 56:5
questions [8] 5:22 6:8 7:15 8:13
    15:13,23 16:2 65:3
quick [1] 64:24

R

read [8] 7:23 35:17,19 44:2 56:19,
    21 63:6 66:11
really [3] 35:20 42:15 49:3
reason [8] 7:14 69:17,22 70:3,8,13,
    18,22
recall [9] 8:6,10 24:18 25:3,18 30:
    18 35:21 48:9 64:3
receipt [5] 8:21 26:8,21 28:19 29:
    4 30:22 35:17 36:2,10,17 38:22 39:
    7 41:2 42:9 45:10,16 50:5 56:15,16
    60:5 62:9,14 64:2,6,11
receipts [2] 36:14 53:24
receive [13] 8:3 18:10,13 32:6,16,
    19 33:18 40:10 55:8 57:10,11 62:2
    64:17
received [11] 25:8 26:9 34:17 38:
    22 39:21 45:9 52:22 58:15 60:5 64:
    2,12
receiving [2] 39:13 53:1
recent [3] 17:19,20 19:5
recently [1] 16:18
recess [2] 63:20 65:1

CHRISTOPHER WOODS - AUGUST 4, 2008

recite [1] 33:8
reckless [3] 19:10,18,19
recognize [5] 23:15 28:19 33:12 47:21 58:7
recollection [2] 25:10 58:24
record [4] 4:10 9:1 33:8 51:23,24 56:21
recorded [1] 67:20
recording [1] 5:7
recovery [2] 44:21 55:8
redacted [1] 48:16
reduced [1] 19:17
refer [1] 39:10
reference [1] 22:19
referrals [1] 39:22
referring [2] 39:14,19
reflect [2] 4:10 33:21
reflects [2] 9:2 33:20
refresh [1] 58:23
regarding [1] 56:12,15
registers [1] 53:23
related [1] 68:4
relating [1] 57:14
relation [1] 22:20
remember [7] 23:12,14 24:16,20 25:5,6,7
rent [1] 10:16
repeat [1] 56:18
rephrase [1] 50:10
report [2] 16:24 17:1
reporter [11] 5:8,9 6:4 22:11 24:2 28:16 31:5 33:5 35:14 47:18 58:2
represent [4] 4:8 22:21 47:8 48: 20 50:7,18 51:9 52:5 55:11 61:16 62:10
representative [3] 40:7,10 50:16
represented [1] 4:18
representing [1] 50:12
request [2] 16:2 58:6
requested [2] 8:20 64:1
requests [2] 15:24 58:5
requirement [1] 53:10
requirements [2] 38:19 53:22
reserve [1] 65:4
residence [1] 11:13
residences [1] 12:1
respects [1] 60:11
response [3] 58:4,5,19
responsible [1] 53:13
result [2] 39:22 50:3
retail [2] 29:12 37:13
retailer [1] 53:16
retain [1] 22:21
retained [1] 43:8
retract [1] 54:21
return [1] 64:8
review [12] 20:24 21:3,6 24:14 33: 11 36:2 52:9,12,13 56:3,4 58:2
reviewed [6] 8:11,15 21:20 25:4,11, 21
reviewing [2] 31:23 34:4
revised [1] 63:24

revolving [2] 31:7 32:5
rh [5] 33:9,9,21 34:9 35:16
ring [9] 9:16 27:7 28:5 29:10 40:18 45:8 64:18
roger [1] 56:16
rogers [78] 1:7 4:8,9,13,14 20:18 26:3,9 27:4,12,24 28:2,3 29:4 30:2, 6,12 31:8,13,18 32:7,14,16,19 33:7, 17 34:17,20 35:22 36:8,13,18,19 37: 5 38:14,18,22 39:6 40:1,15,18 41:4, 5,9,14,24 42:1,13,19 43:1,3,11 49:7 50:4 51:20 52:7,22 53:8,21 54:24 55:3,7,14 56:12 57:7 60:2,7 61:12, 19 62:9 63:15 64:2,12,17 66:6 67: 13,13 69:7
roommate [1] 11:19
roughly [4] 9:21 14:17 34:4 57:9
rpr [1] 1:16
rules [2] 1:13 4:12
rung [1] 37:16

## S

sales [3] 16:16,17 43:14
same [1] 28:5
saying [2] 44:20,24
school [4] 11:20 12:16 14:22,24
seal [1] 68:8
sears [8] 14:13,16,18,20 37:11,16 43:15,18
second [3] 27:17,24 51:23
security [2] 41:19 42:6
see [14] 8:24 28:10,22 29:12,16 31: 8 34:11 36:9 48:2,3 56:19 58:21 59: 8 64:8
seeking [1] 26:16
seen [7] 24:8 45:3,4 52:11,14,18 53: 2
selling [1] 29:17
send [1] 44:20
sense [1] 25:2
sent [5] 8:2 21:10,17 58:10 59:3,5, 10
sentence [3] 18:6 19:19 20:9
series [1] 33:6
service [2] 16:23 16:13
set [2] 58:4 68:7
settlement [1] 51:3
sheet [1] 8:12
shop [1] 61:12
shopped [1] 27:12
shortly [1] 36:13
show [2] 23:19 57:20
showed [2] 45:16 52:19
showing [2] 63:22 64:5
shown [2] 22:11 52:2
shows [1] 33:24
shrugs [1] 5:10
sick [1] 17:6
side [1] 28:18
sides [1] 64:7
sign [1] 48:3
signature [9] 28:21,24 31:9 47:24 65:4

signed [5] 48:7 9,11,13 49:20
since [9] 9:16 13:24 16:11 25:20 27: 11,14,16 57:6 60:7
sir [37] 6:19,23 9:8 10:8 11:8 12:17 14:2 17:15 19:22 20:7,17 22:15,19 23:14,17 24:2,9 25:15 28:16 31:6 32:4 33:5,11 35:6 44:9 47:18,21 50: 2 52:2 54:12 58:2,7,18,21 63:22,24 64:9
sites [2] 15:17 16:1
sober [1] 18:21
social [2] 41:19 42:6
software [1] 15:15
sold [1] 14:19
somebody [1] 37:9
someone [15] 10:19 11:5 37:5 40: 13,14,17 41:1,14,18,24 42:13,24 43: 10 51:13 55:10
somewhere [1] 42:7
sorry [3] 13:8 44:7 56:10
sort [4] 28:9 30:11 61:5 64:7
sounds [1] 51:3
south [1] 12:20
speaking [3] 6:7 24:24 40:13
specialty [1] 13:17
specific [1] 25:10
spell [1] 10:6
split [1] 32:13
spoken [4] 5:9 46:10,12 63:14
staff [1] 16:1
stanton [26] 3:6 4:6,8 8:24 9:5,7 22: 10 23:5 24:1 28:7,15 31:4 33:4 35: 13 47:17 51:23 52:1 55:21,22 56: 19 57:5 58:1 63:18,21 64:24 65:2
started [3] 14:9 16:16,17
state [5] 1:18 4:16 13:22 67:1,6
stated [1] 55:11
statement [2] 34:10 54:1
statements [1] 33:7
states [6] 1:1,14 24:6 66:1 67:10 69:1
stating [1] 25:17
statutory [1] 50:9
stayed [1] 12:3
stenographically [1] 67:20
stepfather [4] 37:22 43:23 46:24 59:1
steve [1] 37:24
steven [1] 59:1
still [3] 12:11 55:23 61:2
stopped [3] 60:3,24,24
store [4] 30:4 37:7 39:2 61:13
street [1] 11:19
strike [4] 30:9 37:9 56:13 63:22
student [1] 15:1
study [1] 15:4
stuff [1] 30:23
styled [1] 22:13
subjected [1] 50:3
sued [1] 44:11
suit [3] 57:18,18 68:5
suite [1] 2:8

supervisor [4] 15:8,9 16:14,15
supplemental [2] 58:3,18
support [4] 15:8,9 16:14,15
sustained [1] 50:12
sworn [4] 4:1,4 66:10 67:16

## T

talked [2] 21:6 45:21
tara [1] 10:3
taxed [1] 49:9
technical [1] 15:13
term [2] 41:16 56:24
terms [5] 39:18 49:24 50:18 51:6 55:18
testified [4] 4:4 5:2 42:21 49:24
testify [2] 57:1 67:17
testimony [5] 66:16 67:19,23 68:7 69:11
theft [7] 41:17 42:2,14,15 43:2,10 59:23
thereof [1] 68:6
third [1] 47:23
though [4] 9:21 42:22
thousand [1] 13:13
three [4] 17:18 18:22 23:6 47:19
ticket [1] 19:14
title [2] 15:6 16:12
today [4] 4:18 7:5,16 8:21
today's [1] 5:5
took [2] 17:8 41:1
top [2] 24:16 25:7
torture [1] 5:16
touched [1] 61:5
train [1] 11:16
training [1] 13:23
transcribed [1] 67:21
transcript [5] 6:5 28:9 66:12,15 67: 23
treatment [2] 18:10,14
trial [3] 17:7,9 18:3
troy [15] 32:2 37:24 38:3,9,19 39:10, 10,13,17,24 45:13 59:1,5,10 62:20
true [4] 21:20 25:23 66:15 67:22
truncate [2] 39:7 50:4
truncated [3] 36:6,9 38:24
truncating [1] 43:19
truncation [1] 53:9
truth [3] 67:17,17,18
try [1] 17:8
trying [3] 25:5,7 60:23
turning [1] 32:4
tv [1] 46:3
twice [1] 57:9
two [9] 13:13 16:23 17:5,8 18:7,8 22:23 64:6,7
typically [1] 35:8

## U

u.s [2] 21:18 57:12
uh-huhs [1] 5:10
ultimately [2] 32:16 47:7
understand [16] 5:13,23,24 6:11, 16 7:15 43:15 45:7 49:10 54:4,24

CHRISTOPHER WOODS - AUGUST 4, 2008

**55:**6,10,12,15 **61:**6

**understanding** [11] **26:**2,14,15 **27:**1 **40:**9,14,19,23 **48:**17 **55:**19 **60:**1

**understood** [2] **6:**17 **54:**16

**undetermined** [1] **67:**10

**union** [1] **15:**3

**unit** [1] **10:**13

**united** [6] **1:**1,14 **24:**6 **66:**1 **67:**10 **69:**1

**unlike** [1] **5:**11

**unpleasant** [1] **5:**16

**until** [1] **45:**21

**up** [2] **8:**7 **37:**16

**update** [1] **57:**11

**updates** [1] **46:**15

**using** [3] **28:**1 **40:**18 **43:**10

### V

**vacation** [3] **17:**3,5,10

**verdict** [2] **50:**22 **51:**6

**verify** [1] **36:**5

**versus** [3] **4:**13 **20:**18 **50:**9

**violated** [1] **60:**3

**violates** [1] **26:**12

**violating** [1] **56:**17

**violation** [1] **53:**24

**visa** [1] **29:**20

**visit** [2] **27:**18 **30:**3

**visited** [1] **27:**24

**vs** [3] **1:**6 **66:**5 **69:**6

### W

**w-e-b** [1] **14:**5

**wait** [1] **6:**6

**way** [11] **5:**12 **7:**7 **10:**13 **25:**11 **41:**13, 23 **42:**24 **43:**4,5 **68:**4,5

**ways** [1] **42:**16

**web** [10] **14:**5,8 **15:**7,17,20 **16:**1,5,9, 11 **17:**4

**wednesday** [1] **10:**23

**week** [5] **8:**5 **17:**5,8 **45:**19,20

**weeks** [6] **17:**5,8 **18:**7,8 **22:**23 **23:**6

**westmont** [2] **11:**1 **19:**3

**whatever** [3] **51:**2 **60:**3 **64:**19

**whatsoever** [2] **47:**4 **56:**12

**wheaton** [2] **11:**9,15

**wherein** [1] **67:**12

**whereof** [1] **68:**7

**whether** [4] **25:**4,11 **41:**20 **50:**23

**whole** [2] **61:**19 **67:**17

**whom** [2] **16:**24 **46:**8

**will** [25] **4:**16 **5:**19,19 **6:**6,8 **9:**5 **28:**8, 9,9 **29:**2 **33:**8 **48:**19,20 **50:**12,14,15, 17,18 **51:**14 **52:**5,10 **55:**7 **56:**2,3 **65:**4

**willfully** [7] **53:**21 **54:**2,4,14,15 **55:**1,7

**willfulness** [2] **56:**17,24

**willing** [2] **17:**12 **49:**17

**win** [1] **49:**8

**winthrop** [1] **10:**13

**wit** [1] **67:**7

**withdraw** [2] **41:**15 **50:**1

**within** [2] **1:**17 **67:**5

**witness** [8] **3:**3 **4:**1,3 **8:**23 **23:**3 **57:**4 **67:**9,21

**woodridge** [1] **14:**6

**woods** [24] **1:**3,11 **3:**4 **4:**2,11,13,17 **20:**18 **22:**7 **23:**21 **28:**12 **31:**1 **33:**1 **35:**10 **47:**14 **57:**22 **66:**3,9 **67:**8,12, 16 **69:**3,24 **70:**24

**word** [2] **5:**9 **54:**12

**words** [2] **17:**24 **55:**20

**work** [5] **14:**16 **15:**4,16 **37:**13 **63:**12

**worked** [3] **14:**8,13 **37:**11

**worker** [1] **15:**1

**working** [2] **16:**20 **43:**19

**works** [1] **46:**14

**worth** [1] **41:**5

**wreckless** [1] **19:**15

**written** [1] **47:**11

### Y

**year** [7] **9:**19 **11:**4 **14:**9,11 **16:**11 **17:**3 **35:**6

**years** [2] **13:**6 **18:**22

**yellow** [1] **64:**6

**yourself** [1] **11:**18

### Z

**zero** [1] **30:**8

**zoloft** [2] **6:**22 **7:**5